

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 17-** *Cn 137* |
| | : | |
| **v.** | : | **DATE FILED:  March 21, 2017** |
| | : | |
| **RUFUS SETH WILLIAMS** | : | **VIOLATIONS:** |
| | : | |
| | : | **18 U.S.C. § 1952 (Travel and Use of** |
| | : | **Interstate Facilities to Promote and** |
| | : | **Facilitate Bribery Contrary to** |
| | : | **Pennsylvania Law - 10 counts)** |
| | : | **18 U.S.C. § 1951 (Hobbs Act Extortion** |
| | : | **- 2 counts)** |
| | : | **18 U.S.C. §§ 1343 & 1346 (Honest** |
| | : | **Services Wire Fraud - 5 counts)** |
| | : | **18 U.S.C. § 1343 (Wire Fraud - 6 counts)** |
| | : | **Notice of Forfeiture** |

## INDICTMENT

**THE GRAND JURY CHARGES THAT:**

## COUNTS ONE TO FIVE
### (Travel and Use of Interstate Facilities to Promote and Facilitate Bribery Contrary to Pennsylvania Law)

### Introduction

1.　At all times relevant to Counts One to Five of this Indictment:

　　a.　Defendant RUFUS SETH WILLIAMS was the District Attorney for the City and County of Philadelphia, Pennsylvania, the largest prosecutor's office in Pennsylvania.  He was elected to his first four-year term on or about November 3, 2009, was sworn into office on or about January 4, 2010, and was reelected on or about November 6, 2013. In this capacity, defendant WILLIAMS received an annual salary of approximately $170,000. Defendant WILLIAMS was the chief law enforcement officer for the City and County of

Philadelphia and served approximately 1.5 million residents. Defendant WILLIAMS supervised approximately 300 Assistant District Attorneys, in addition to numerous detectives and support staff. As the District Attorney, defendant WILLIAMS was in a position to influence, and did influence, actions taken by and on behalf of the District Attorney's Office (the "DAO") and other City and County law enforcement personnel, including with respect to cases handled by the DAO. From in or about 2005 to in or about 2008, defendant WILLIAMS served as Inspector General of the City of Philadelphia. As Inspector General, defendant WILLIAMS was responsible for the investigation of corruption, fraud, waste, abuse, and employee misconduct among municipal workers and companies doing business with the City of Philadelphia.

b.      Business Owner #1 owned a business that sold prepaid telephone cards. Defendant WILLIAMS first met Business Owner #1 in or about early 2010.

c.      Person #1 was the subject of a criminal case being prosecuted by the DAO and was a friend of Business Owner #1.

d.      Person #2 was defendant WILLIAMS's girlfriend.

e.      Police Official #1 was an official in the Philadelphia Police Department (the "PPD"), whose responsibilities included supervising security matters at the Philadelphia International Airport.

2.      As the District Attorney for the City and County of Philadelphia, defendant WILLIAMS had an obligation to file Statements of Financial Interest ("SFI") with the City of Philadelphia reporting financial interests that he held during the previous calendar year, according to the City of Philadelphia's Code of Ethics. Defendant WILLIAMS was required to disclose the name and address of any person (not including family members) who gave him gifts during the prior calendar year that were worth $200 or more in the aggregate. For each gift,

2

defendant WILLIAMS was required to disclose the name and address of the source, its amount or value, and the circumstances of the gift. Gifts included anything of value, such as services, loans, entertainment, meals and tickets to sporting events, including: (1) the value of any benefit worth $200 or more received by virtue of a loan made upon terms that were commercially unreasonable in the ordinary course of business; and (2) any transaction in which the amount of money or property value received by the office holder (or a member of his immediate family) exceeded the money or property value that was paid or exchanged by the office holder (or a member of his immediate family). Defendant WILLIAMS also was required to report each loan or debt over $5,000 (except for the mortgage on his principal residence) and any direct or indirect source of income of $500 or more.

3.     As a public official of the Commonwealth of Pennsylvania, defendant WILLIAMS also had an obligation to file an SFI with the Commonwealth of Pennsylvania, according to Pennsylvania's Public Official and Employee Ethics Act. For each source of gifts having an aggregate value of $250 or more, defendant WILLIAMS was required to disclose the name and address of the source; the circumstances, including a description, of each gift; and the value of each gift. Defendant WILLIAMS's Commonwealth disclosure requirements, however, did not obligate him to disclose gifts from friends or family members when the circumstances made it clear that the motivation for the action was a personal or family relationship. Further, under his Commonwealth disclosure obligations, defendant WILLIAMS was required to disclose the source and amount of each payment or reimbursement by the source for transportation, lodging, or hospitality that he received in connection with his public position if the aggregate amount of each such payment or reimbursement by the source exceeded $650 for the calendar year. Under his Commonwealth disclosure obligations, defendant WILLIAMS also was required

3

to report each loan or debt over $6,500 and any direct or indirect source of income of $1,300 or more.

### Defendant WILLIAMS's Unlawful Arrangement with Business Owner #1

4.     From in or about July 2010 to in or about May 2015, defendant WILLIAMS engaged in an arrangement with Business Owner #1 pursuant to which defendant WILLIAMS would solicit, accept, and agree to accept a stream of concealed pecuniary benefits ("benefits") for himself and Person #2, such as travel, money, and other things of value, from Business Owner #1 and, as consideration and in exchange for these benefits, defendant WILLIAMS would reciprocate by performing and agreeing to perform official acts on behalf of Business Owner #1 and by violating his legal duties as specific opportunities arose.

### Defendant WILLIAMS's and Person #2's Acceptance of Valuable Benefits from Business Owner #1

5.     From in or about July 2010 to in or about May 2015, defendant WILLIAMS and Person #2 solicited, accepted, and agreed to accept the following valuable benefits provided and arranged by Business Owner #1 on or about the dates listed below:

| DATE | VALUABLE BENEFITS |
|---|---|
| January 2012 | A Louis Vuitton tie for defendant WILLIAMS worth approximately $205, and an iPad for defendant WILLIAMS worth approximately $300. |
| February 1, 2012 to February 5, 2012 | Expenses for defendant WILLIAMS and Person #2 to travel to, and stay at, an all-inclusive resort in Punta Cana, Dominican Republic (the "Punta Cana Resort") worth approximately $4,805, to include "royal service" bracelets that permitted defendant WILLIAMS and Person #2 access to a private beach and personal butler services for their luxury suite, round-trip airline tickets for defendant WILLIAMS and Person #2 worth approximately $1,576, and meals and amenities received during such trip. |

4

| DATE | VALUABLE BENEFITS |
|---|---|
| February 24, 2012 to April 24, 2012 | A custom sofa for defendant WILLIAMS worth approximately $3,212. |
| August 22, 2012 | A $502 dinner for defendant WILLIAMS and Person #2 at a restaurant in Philadelphia, Pennsylvania. |
| March 15, 2013 | A $7,000 check for defendant WILLIAMS. |
| October 2013 | $2,000 cash for defendant WILLIAMS. |
| July 2010 to May 2015 | A Burberry watch for defendant WILLIAMS, a Burberry purse for Person #2, and meals and other valuable benefits for defendant WILLIAMS and Person #2. |

### Defendant WILLIAMS's Agreement to Perform Official Acts in Favor of Business Owner #1

6.     From in or about July 2010 to in or about May 2015, as consideration and in exchange for these benefits, defendant WILLIAMS agreed to use his official position to assist Business Owner #1, to include the following:

| DATE | USE OF OFFICIAL POSITION |
|---|---|
| Between in or about December 2011 and in or about September 2014 | To assist Business Owner #1 in limiting security screening by law enforcement authorities at the United States border when attempting to return to the United States after foreign travel, to include: (a) defendant WILLIAMS's numerous contacts with Police Official #1 to exert pressure on and advise Police Official #1 in an attempt to cause Police Official #1 to assist Business Owner #1 with such encounters, and (b) defendant WILLIAMS's repeated offers to write an official letter, under defendant WILLIAMS's authority as the District Attorney, to another public official on behalf of Business Owner #1 in an attempt to exert pressure on and advise such public official to assist Business Owner #1 with such encounters. |
| Between in or about February 2012 and in or about September 2012 | To assist Business Owner #1's associate, Person #1, in connection with a criminal case and matter under investigation by the DAO, to include obtaining a more favorable plea offer for Person #1. |

5

### Defendant WILLIAMS's Failure to Timely Report Valuable Benefits
### that Defendant WILLIAMS Accepted from Business Owner #1

7.     From in or about June 2013 to in or about April 2014, defendant WILLIAMS signed, filed, and caused to be filed State and City SFIs for the reporting years 2012 and 2013 that intentionally omitted reference to valuable benefits received in those years by defendant WILLIAMS from Business Owner #1, as described in paragraph 5 above, in order to conceal defendant WILLIAMS's unlawful arrangement with Business Owner #1.

8.     On or about July 29, 2016, and August 15, 2016, well after the federal law enforcement investigation had become known to him, defendant WILLIAMS filed amended City and State SFIs, reporting his receipt of a number of valuable benefits, including many of the benefits that he received from Business Owner #1, as described in paragraph 5 above.

### The Charges

9.     On or about the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, defendant

### RUFUS SETH WILLIAMS

and Business Owner #1 knowingly and intentionally did travel and cause, procure, and induce travel in interstate and foreign commerce and use and cause, procure, and induce the use of facilities in interstate and foreign commerce, as set forth below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity – namely, bribery contrary to 18 Pa. C. S. § 4701 – and, thereafter, performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as set forth below:

6

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| ONE | On or about February 1, 2012, defendant WILLIAMS and Person #2 traveled from Philadelphia to Punta Cana, Dominican Republic. | (a)  Between on or about February 1, 2012 and February 5, 2012, defendant WILLIAMS caused, induced, and procured Business Owner #1 to pay for the significant expenses for defendant WILLIAMS's and Person #2's travel to, and stay at, the Punta Cana Resort, including lodging in the "Royal Service Presidential Suite" there. <br><br> (b)  Between on or about February 1, 2012, and February 5, 2012, while in Punta Cana, defendant WILLIAMS was asked by Business Owner #1 for official assistance in connection with a criminal case and matter under investigation by the DAO against Person #1, and defendant WILLIAMS agreed to provide such official assistance. <br><br> (c)  On or about February 8, 2012, in Philadelphia, defendant WILLIAMS exchanged the following text messages[1] with Business Owner #1 regarding defendant WILLIAMS providing official assistance to Person #1 and receiving further valuable benefits from Business Owner #1: <br><br> (i)  Defendant WILLIAMS received a text message from Business Owner #1, requesting defendant WILLIAMS's official assistance in connection with a criminal case and matter under investigation by the DAO against Person #1, which stated: "the guy pleaded guilty, he will take any |

---

[1]      All of the text messages, letters, and other materials quoted in this indictment bear the same spelling, punctuation, and grammar as found in the originals of these records.

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | punishment but he just doesn't wanna do jail! . . . If you can do anything for him it would be very appreciative (as long as you have no problem with it)." |
| | | (ii)  Defendant WILLIAMS sent a text message to Business Owner #1, stating: "I will look into it." |
| | | (iii)  Very shortly after the text message referenced as Subsequent Act (c)(ii) of this Count, defendant WILLIAMS sent Business Owner #1 a text message, asking: "April?", referring to scheduling a second anticipated trip to Punta Cana paid for by Business Owner #1. |
| | | (iv)  Defendant WILLIAMS sent a text message to Business Owner #1, stating: "I am merely a thankful beggar and don't want to overstep my bounds in asking... but we will gladly go," referring to the second anticipated free trip to Punta Cana paid for by Business Owner #1. |
| | | (d)  On or about February 24, 2012, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #1 regarding defendant WILLIAMS receiving further valuable benefits from Business Owner #1: |
| | | (i)  Defendant WILLIAMS received a text message from Business Owner #1, which included a photograph of a sofa, asking: "Is that it?" |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (ii)  Defendant WILLIAMS sent a text message to Business Owner #1, replying: "That is the exact one...but the special order color Chocolate." |
| TWO | On or about February 24, 2012, in Philadelphia, defendant WILLIAMS caused, procured, and induced Business Owner #1 to pay approximately $3,212 by use of a credit card transaction in interstate commerce to purchase a sofa for defendant WILLIAMS. | (a)  On or about April 6, 2012, defendant WILLIAMS exchanged the following text messages with Business Owner #1 regarding defendant WILLIAMS's receipt of the sofa from Business Owner #1: <br><br> (i)  Defendant WILLIAMS sent Business Owner #1 a text message, stating: "The sofa will be delivered tomorrow . . . how would you like me to re-pay you?" <br><br> (ii)  Defendant WILLIAMS received a text message from Business Owner #1, replying: "Stop it!  I don't expect anything in return when I gift my friends  :) .... Enjoy!" <br><br> (iii)  Defendant WILLIAMS sent a text message to Business Owner #1, replying: "Well I sincerely appreciate the gift . . .  but I didn't expect that, and I don't want you to think I mentioned it so that you would get us a gift.  That is a wonderful gift and we are very, very thankful." <br><br> (b)  On or about April 7, 2012, defendant WILLIAMS caused the sofa to be placed in his home in Philadelphia. |

9

| THREE | On or about August 22, 2012, defendant WILLIAMS caused, procured, and induced Business Owner #1 to pay approximately $502 by use of a credit card transaction in interstate commerce for the expenses in connection with dinner with defendant WILLIAMS and Person #2 at a restaurant in Philadelphia. | (a)  On or about September 18, 2012, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #1 regarding defendant WILLIAMS providing official assistance to Person #1:<br><br>    (i)  Defendant WILLIAMS received a text message from Business Owner #1, stating: "Boss man, sorry to bother you, remember a few months back I asked you if you can help with a case for a friend of my friends at [a Philadelphia] night club!  They been asking me, and to be honest I was shy to ask you!!!  He has a court tomorrow an he is looking at 1.5-3 years In Jail plus 6 years probation!  Is there anything you can do for him.... he regret it badly and he was begging me if he can get 1 year or so, so he can be in Philly prison not out of state.  Believe me I feel bad asking you!  Thank u Seth.  This is his case info: [Case Number].  Feb 17th suppression hearing.  [Person #1]."<br><br>    (ii)  Defendant WILLIAMS sent a text message to Business Owner #1, replying: "Was he already found guilty?"<br><br>    (iii)  Defendant WILLIAMS received a text message from Business Owner #1, replying: "Yes he was!  He pleaded guilty!  And they gave him till tomorrow to take the deal which is 1.5 to 3 + 6 years probation."<br><br>    (iv)  Defendant WILLIAMS sent a text message to Business Owner #1, replying: "If he pleaded guilty, and from the sentence it seems that there is a mandatory sentence.  There is very |

little I can do the day before without it looking extremely suspicious..."

(v)  Defendant WILLIAMS received a text message in response from Business Owner #1, stating: "Sorry Seth he just texted me, I'll text you what he just sent me: No not yet. My trial date is tomorrow.  [Assistant District Attorney] offered me 1.5-3 years.  I am trying to get a slightly better offer.  11.5-23 months.  I have a very strong case for dismissial but if I don't get it I probably will get 5 yrs...." and "So he didn't plead guilty yet!"

(vi)  Defendant WILLIAMS sent a text message to Business Owner #1, replying: "It seems like he has the possibility of having it thrown out or continued ... if it gets continued I will then ask for the file and see what can be done to make it a county sentence..."

(vii)  Defendant WILLIAMS received a text message from Business Owner #1, replying: "Thank you Seth! I appreciate it.  Ill let him know. Sorry again Seth."

(viii)  Defendant WILLIAMS sent a text message to Business Owner #1, replying: "In the future always give me at least a week to help a friend ... I have no problem looking into anything... I can't promise I will drastically change anything once it has gotten to the trial stage but I can always look into it[.]"

(ix)  Defendant WILLIAMS received a text message from Business Owner #1, replying: "You know I was hesitating to ask!!! I know you would help me but I wasn't sure if it's something that can bring suspicion, and this is the last thing I want To do to a

11

| | | |
|---|---|---|
| | | friend like you Seth!  I care about you, I want to see you the next mayor and the next governor and maybe the next president :)"<br><br>(b)  On or about November 15, 2012, in Philadelphia, defendant WILLIAMS sent a text message to Business Owner #1, stating in part: "If you are planning more trips to Punta or Vegas feel free to drag me along[.]" |
| FOUR | On or about March 12, 2013, in Philadelphia, defendant WILLIAMS used a facility in interstate commerce to receive an email sent by a DAO employee to defendant WILLIAMS, and members of defendant WILLIAMS's security detail who were responsible for transporting defendant WILLIAMS, to schedule and arrange transportation for defendant WILLIAMS to attend a March 15, 2013 meeting among defendant WILLIAMS, Business Owner #1, and Police Official #1. | (a)  On or about March 15, 2013, in Philadelphia, defendant WILLIAMS attended a meeting with Business Owner #1 and Police Official #1 at which defendant WILLIAMS asked Police Official #1 to assist Business Owner #1 in connection with security screening by law enforcement authorities at the United States border when attempting to return to the United States from foreign travel. Specifically, WILLIAMS asked Police Official #1 to assist Business Owner #1 in avoiding secondary screening on the occasions that Business Owner #1 reentered the United States at the Philadelphia International Airport upon returning from overseas trips.<br><br>(b)  On or about March 15, 2013, immediately after their meeting with Police Official #1 in Philadelphia, defendant WILLIAMS accepted a $7,000 check from Business Owner #1.<br><br>(c)  On or about March 16, 2013, in Philadelphia, defendant WILLIAMS deposited into his account at a financial institution the $7,000 check that he accepted from Business Owner #1. |

12

| FIVE | On or about February 24, 2014, in Philadelphia, defendant WILLIAMS sent a text message in interstate commerce to Business Owner #1, offering and agreeing to draft and send an official letter in an effort to influence the conduct of law enforcement officials conducting screenings of Business Owner #1 upon Business Owner #1's return flights from abroad, including by stating, "Give me the information of the Homeland Security folks that were running the investigation so I can send a letter." | From on or about February 24, 2014, to on or about February 28, 2014, in Philadelphia, defendant WILLIAMS sent additional text messages to Business Owner #1, offering and agreeing to draft and send an official letter in an effort to influence the conduct of law enforcement officials conducting screenings of Business Owner #1 upon Business Owner #1's return flights from abroad, specifically stating:<br><br>(a) "No, I want to send a letter to whomever the people in [the public official's] office spoke with at Homeland Security."<br><br>(b) "I need the info...case number, agent anything so I can write a letter to the correct person of supervisory authority."<br><br>(c) "I want there to be a letter in your file from the D.A. of Philadelphia."<br><br>(d) "So get me whatever info you think I need. Thanks."<br><br>(e) "[Business Owner #1]...I still want the info so I can send the letter."<br><br>(f) "That plus the exact agency and agent that conducted the original investigation." |
|------|------|------|

In violation of Title 18, United States Code, Section 1952(a)(3) and Section 2.

13

## COUNT SIX
### (Obstructing and Affecting Interstate and Foreign Commerce
### by Extortion Under Color of Official Right)

1.       Paragraphs 1 to 8 of Counts One to Five of this Indictment are incorporated here.

2.       At all times relevant to Count Six of this Indictment:

a.       Business Owner #1 traveled and paid for goods and services in interstate and foreign commerce.

b.       Person #1 was charged with offenses that subjected Person #1 to a potential term of imprisonment in a correctional facility run by the Pennsylvania Department of Corrections and the Philadelphia Department of Prisons, which were government agencies engaged, and who purchased goods and services, in interstate commerce.

3.       From in or about July 2010 to on or about May 5, 2015, in the Eastern District of Pennsylvania, and elsewhere, defendant

### RUFUS SETH WILLIAMS

did knowingly and willfully obstruct, delay, and affect interstate and foreign commerce, and attempt so to do, by extortion under color of official right – that is, by agreeing to obtain and obtaining money and other things of value from Business Owner #1, with consent, in exchange for defendant WILLIAMS's exercise of, and agreement to exercise, official authority and influence as specific opportunities arose, including with respect to:

a.       Assisting Business Owner #1 in limiting security screening by law enforcement authorities at the United States border when attempting to return to the United States after foreign travel, to include: (i) defendant WILLIAMS's numerous contacts with Police Official #1 to exert pressure on and advise Police Official #1 in an attempt to cause Police Official #1 to assist Business Owner #1 with such encounters, and (ii) defendant WILLIAMS's

14

repeated offers to write an official letter, under defendant WILLIAMS's authority as the District

Attorney, to another public official on behalf of Business Owner #1 in an attempt to exert

pressure on and advise such public official to assist Business Owner #1 with such encounters;

and

            b.     Assisting Business Owner #1's associate, Person #1, in connection

with a criminal case and matter under investigation by the DAO, to include obtaining a more

favorable plea offer for Person #1.

            In violation of Title 18, United States Code, Sections 1951(a) and (b)(2) and

Section 2.

### COUNTS SEVEN TO ELEVEN
### (Travel and Use of Interstate Facilities to Promote
### and Facilitate Bribery Contrary to Pennsylvania Law)

1.      Paragraphs 1(a) and (d) and 2 to 3 of Counts One to Five of this

Indictment are incorporated here.

#### Introduction

2.      At all times relevant to Counts Seven to Eleven of this Indictment:

a.      Business Owner #2 was an associate of defendant WILLIAMS

who, along with Business Owner #2's relative, Business Owner #3, owned and operated bars in

Philadelphia and San Diego, California.  On or about June 29, 2010, Business Owner #2 pled

guilty to corruptly endeavoring to impede the due administration of the federal tax code, and

Business Owner #2's business entity pled guilty to two counts of federal tax evasion.  On or

about November 16, 2010, Business Owner #2 was sentenced to 3 years' probation and a

$30,000 fine, and the business entity was sentenced to 5 years' probation and a $562,063.04 fine.

A federal judge in Philadelphia terminated Business Owner #2's probation on or about April 9,

2013.

b.      The California Department of Alcoholic Beverage Control

("CDABC") was responsible for presiding over, and making determinations on, administrative

hearings related to the acquisition and retention of California liquor licenses.  On or about June

6, 2013, the CDABC filed an Accusation under the Alcoholic Beverage Control Act and State

Constitution (the "Accusation") seeking suspension or revocation of the liquor license of a

business entity of which Business Owner #2 was President, Secretary, Director and a corporate

stockholder.  The Accusation alleged that Business Owner #2's federal tax conviction was

16

grounds for suspension or revocation of the liquor license because it was for "a crime, under the circumstances, involving moral turpitude."

        c.     Person #3 was an associate of Business Owner #2.

      3.     Pursuant to a Philadelphia city ordinance 21-2000, *et seq.*, police accident reports were confidential and not available to the public, except as provided under Commonwealth of Pennsylvania law. Police accident reports were available to persons involved in the accident, their attorney or insurer, the Federal Government, and Commonwealth agencies. *See* 75 Pa. C.S. § 3751(b)(1); *see also* Section 1 of the City of Philadelphia Department of Records Police Accident Report Regulation (hereinafter "Section 1") at Section 1(1). Persons legally eligible to receive police reports were required to fill out an application to the City of Philadelphia Department of Records, submit an affidavit swearing that they were eligible, present valid photo identification or other adequate proof of identity, and pay a $25 fee. Section 1(2). Regulations governing the City of Philadelphia Department of Records, which set forth the procedure for obtaining police reports, provided that police accident reports should not be made available from the Department of Records in any manner except as provided in this Regulation.

### Defendant WILLIAMS's Unlawful Arrangement with Business Owner #2

      4.     From in or about March 2012 to in or about July 2015, defendant WILLIAMS engaged in an arrangement with Business Owner #2 pursuant to which defendant WILLIAMS would solicit, accept, and agree to accept a stream of concealed pecuniary benefits for himself, his family members, and Person #2, such as airline tickets, money, an automobile, and other things of value, from Business Owner #2 and, as consideration and in exchange for these benefits, defendant WILLIAMS would reciprocate by performing and agreeing to perform

17

official acts on behalf of Business Owner #2 and by violating WILLIAMS's legal duties as
specific opportunities arose.

### Defendant WILLIAMS's Acceptance of Valuable Benefits from Business Owner #2

5.    From in or about March 2012 to in or about July 2015, defendant
WILLIAMS solicited, accepted, and agreed to accept the following valuable benefits provided
and arranged by Business Owner #2 on or about the dates listed below:

| DATE | VALUABLE BENEFITS |
| --- | --- |
| March 2012 | Round-trip airline tickets for defendant WILLIAMS and two family members to Florida, worth approximately $856.80. |
| October 2012 | Round-trip airline tickets to, and lodging for defendant WILLIAMS and Person #2 in, San Diego, California, worth approximately $2,000. |
| March 2013 | Round-trip airline tickets for defendant WILLIAMS and two family members to Florida, worth approximately $1,200. |
| June 2013 | A pre-owned 1997 Jaguar XK8 convertible, worth approximately $4,160, and the value of insurance premiums paid by Business Owner #2 of approximately $380 for a policy on that vehicle from in or about June 2013 to in or about November 2013. |
| December 2013 | Round-trip airline tickets to, and lodging and hospitality for defendant WILLIAMS and Person #2 in, Las Vegas, Nevada, worth approximately $2,000. |
| August 2014 | Round-trip airline tickets to, and lodging for defendant WILLIAMS and two family members in, San Diego, California, worth approximately $2,000. |
| March 2015 | Round-trip airline tickets for defendant WILLIAMS and two family members to Florida, worth approximately $1,048.72. |
| March 2015 – July 2015 | Cash payments to defendant WILLIAMS totaling at least approximately $900. |

### Defendant WILLIAMS's Agreement to Perform Official Acts
### in Favor of Business Owner #2

6.    From in or about November 2012 to in or about July 2015, as consideration and in exchange for these benefits, defendant WILLIAMS agreed to use his official position to assist Business Owner #2, to include the following:

| DATE | USE OF OFFICIAL POSITION |
|---|---|
| November 2012 | To appoint Business Owner #2 as Special Advisor to the DAO, to include:  (a) defendant WILLIAMS issuing an official DAO badge and leather badge holder for Business Owner #2; (b) defendant WILLIAMS issuing a letter in his capacity as the District Attorney, issued in or about May 2013 and back-dated to November 30, 2012, appointing Business Owner #2 to, and outlining official responsibilities for, the position of Special Advisor to the DAO; and (c) defendant WILLIAMS assigning, and agreeing to assign, certain matters to Business Owner #2 in Business Owner #2's capacity as Special Advisor to the DAO. |
| June 2, 2014 | To issue a letter in his capacity as the District Attorney to the CDABC to influence a then-pending proceeding before the CDABC to determine whether or not Business Owner #2 could continue as an officer and corporate stockholder of a business entity that held a California liquor license. |
| July 2015 | To obtain an official police accident report for, and provide it to, Business Owner #2 related to a car accident involving Person #3. |

### Defendant WILLIAMS's Failure to Timely Report Valuable Benefits
### that Defendant WILLIAMS Accepted from Business Owner #2

7.    From in or about March 2013 to in or about May 2016, defendant WILLIAMS signed, filed, and caused to be filed State and City SFIs for the reporting years 2012 through 2015 that intentionally omitted reference to valuable benefits received in those years by defendant WILLIAMS from Business Owner #2, as described in paragraph 5 above, in order to conceal defendant WILLIAMS's unlawful arrangement with Business Owner #2.

8.      On or about July 29, 2016, and on or about August 15, 2016, well after the

federal law enforcement investigation had become known to him, defendant WILLIAMS filed

amended City and State SFIs, reporting his receipt of a number of valuable benefits, including

many of the benefits that he received from Business Owner #2, as described in paragraph 5

above.  On or about January 17, 2017, defendant WILLIAMS entered into a settlement

agreement with the City's Board of Ethics in which defendant WILLIAMS represented and

warranted that, except for his receipt of additional valuable benefits set forth in that agreement,

the information in his amended City SFIs was accurate and complete in all material respects.

However, defendant WILLIAMS's amended City and State SFIs and his settlement agreement

with the City's Board of Ethics still failed to report defendant WILLIAMS's receipt of the pre-

owned 1997 Jaguar XK8 convertible and payment of insurance premiums from Business Owner

#2.

## The Charges

9.      On or about the dates listed below, in the Eastern District of Pennsylvania,

and elsewhere, defendant

### RUFUS SETH WILLIAMS

and Business Owner #2 knowingly and intentionally did travel and cause, procure, and induce

travel in interstate and foreign commerce and use and cause, procure, and induce the use of

facilities in interstate commerce, as set forth below, with the intent to promote, manage,

establish, carry on, and facilitate the promotion, management, establishment, and carrying on of

unlawful activity – namely, bribery contrary to 18 Pa. C. S. § 4701 – and, thereafter, performed

and attempted to perform acts to promote, manage, establish, carry on, and facilitate the

20

promotion, management, establishment, and carrying on of the unlawful activity, as set forth

below:

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|-------|-------------------------------------------------------------|-----------------|
| SEVEN | On or about October 9, 2012, defendant WILLIAMS and Person #2 traveled from Philadelphia to San Diego, California using airline tickets provided by Business Owner #2. | (a)  In or about November 2012, in Philadelphia, defendant WILLIAMS appointed Business Owner #2 as Special Advisor to the DAO. |
|       |                                                             | (b)  On or about November 6, 2012, at approximately 2:11 p.m., in Philadelphia, defendant WILLIAMS sent an email to the Executive Director of his Political Action Committee, forwarding an invoice from a vendor to pay for an official DAO badge and leather badge holder that defendant WILLIAMS obtained for Business Owner #2, stating: "Attached please find an invoice for the badge and wallet [Business Owner #2] wanted.  He paid for my trip in 2009 to visit the D.A. in San Diego and D.A. of San Francisco.  He has given $$$$, will max and will host events at his bars." |
|       |                                                             | (c)  On or about November 6, 2012, at approximately 2:30 p.m., in Philadelphia, defendant WILLIAMS received an email from the Executive Director of his Political Action Committee in response to defendant WILLIAMS's email referenced in Subsequent Act (b) of this Count, stating: "ok." |
|       |                                                             | (d)  On or about November 20, 2012, in Philadelphia, defendant WILLIAMS sent Business Owner #2 a text message, asking: "Have you flashed your badge lately?", referring to the official DAO |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | badge that defendant WILLIAMS obtained and provided to Business Owner #2.<br><br>(e)  On or about November 29, 2012, in Rockledge, Pennsylvania, defendant WILLIAMS caused the Executive Director of his Political Action Committee to use a credit card to pay a vendor approximately $141.63 for the official DAO badge and leather badge holder for Business Owner #2.<br><br>(f)  On or about February 5, 2013, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS receiving further valuable benefits from Business Owner #2:<br><br>(i)  Defendant WILLIAMS sent a text message to Business Owner #2, stating: "It's time again for me to plan for [defendant WILLIAMS's family members'] spring break. I have lined up a friend's home in Key West again. Can you help me with the flight arrangements again. I looked online and saw the tickets were around $230 a piece round trip for the three of us. You may have points you are willing to trade or I could pay u back over 2 months. Thanks."<br><br>(ii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "yes  I will check today."<br><br>(iii)  Defendant WILLIAMS sent a text message to Business Owner #2, |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | stating: "And not to be greedy but maybe we can all go to your place in San Diego before you sell it...maybe August before they start school." (iv)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "ok.  not greedy at all." (v)  Defendant WILLIAMS sent a text message to Business Owner #2, stating: "I case u need the info…" and listing dates of birth for defendant WILLIAMS and his family members. (g)  On or about February 7, 2013, in Philadelphia, defendant WILLIAMS caused, procured, and induced Business Owner #2 to book Air Canada airline tickets for defendant WILLIAMS and his family members for travel on or about March 20, 2013 from Philadelphia, through Charlotte, North Carolina, to Fort Lauderdale, Florida. |
| EIGHT | On or about March 20, 2013, defendant WILLIAMS and two family members traveled from Philadelphia, through Charlotte, North Carolina, to Fort Lauderdale, Florida using airline tickets provided by Business Owner #2. | (a)  On or about April 14, 2013, defendant WILLIAMS sent a text message to Business Owner #2, stating: "This is the mechanic that has the Jaguar," referring to the pre-owned 1997 Jaguar XK8 convertible that defendant WILLIAMS was receiving from Business Owner #2, and providing Business Owner #2 with contact information for a mechanic for the Jaguar. (b)  On or about May 7, 2013, in Philadelphia, defendant WILLIAMS |

23

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | received a text message from Business Owner #2, stating: "sorry to bother, can I get a letter from your office stating that I am and have been since you appointed me your special advisor. Thanks." |
| | | (c) On or about May 9, 2013, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS issuing a letter under his authority as District Attorney pertaining to the appointment and responsibilities of Business Owner #2 as Special Advisor to the DAO and defendant WILLIAMS receiving further valuable benefits from Business Owner #2: |
| | | (i) Defendant WILLIAMS received a text message from Business Owner #2, stating: "what's your office phone number that goes to your secretary?!" |
| | | (ii) Defendant WILLIAMS sent Business Owner #2 a text message containing the telephone number for defendant WILLIAMS's secretary at the DAO. |
| | | (iii) Defendant WILLIAMS received a text message from Business Owner #2, stating: "thanks. I emailed a draft, see if your ok with it and let me know. also, I am heading back to sd after the 21st if you and [Person #2] want to do vegas in the beginning of June, let me know." |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (iv)  Defendant WILLIAMS sent Business Owner #1 a text message, replying: "1. I will write the letter tomorrow. 2. Ok, thanks!"<br><br>(d)  On or about May 10, 2013, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS issuing a letter under his authority as District Attorney pertaining to the appointment and responsibilities of Business Owner #2 as Special Advisor to the DAO and defendant WILLIAMS receiving further valuable benefits from Business Owner #2:<br><br>(i)  Defendant WILLIAMS sent a text message to Business Owner #2, stating: "This is the mechanic that has the Jaguar," referring again to the pre-owned 1997 Jaguar XK8 convertible that defendant WILLIAMS was receiving from Business Owner #2, and providing Business Owner #2 with contact information for a mechanic for the Jaguar.<br><br>(ii)  Defendant WILLIAMS sent Business Owner #2 a text message, asking: "Did you get the letter," referring to the Special Advisor appointment letter.<br><br>(iii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "yes. thank you very much. is it ok if I change the date to November 30, 2012?" |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (iv)  Defendant WILLIAMS sent Business Owner #2 a text message, replying: "Sure." <br><br> (v)  Defendant WILLIAMS sent Business Owner #2 a text message, asking: "Does your mechanic know the problems with the jag?" <br><br> (vi)  Defendant WILLIAMS sent Business Owner #2 a text message, asking: "What type of assignments would you like as Special Advisor." <br><br> (e)  On or about May 10, 2013, in Philadelphia, defendant WILLIAMS provided Business Owner #2 with a letter on official DAO letterhead, backdated to November 30, 2012, bearing defendant WILLIAMS's signature as "District Attorney," stating, among other things: "It is my pleasure to appoint you as a Special Advisor to the Philadelphia District Attorney's office"; "This appointment is effective immediately"; "This position plays an important role within my office and for the citizens of the City of Philadelphia"; and "I know you will take this responsibility seriously and I expect that you will make the time available to participate as needed." <br><br> (f)  In or about June 2013, in Philadelphia, defendant WILLIAMS accepted from Business Owner #2 a pre-owned 1997 Jaguar XK8 convertible, whose insurance Business Owner #2 paid up to on or about November 19, 2013. |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (g)  On or about August 24, 2013, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS and Person #2 receiving further valuable benefits from Business Owner #2: |
| | | (i)  Defendant WILLIAMS received a text message from Business Owner #2, asking: "Vegas November 12?," referring to Business Owner #2's offer to provide defendant WILLIAMS and Person #2 with airline tickets to Las Vegas, Nevada. |
| | | (ii)  Defendant WILLIAMS sent a text message to Business Owner #2, stating: "I am 95% positive.  Let me check Monday.  November 12-?" |
| | | (iii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "Tuesday is 12 I think but we can do 11 I guess for 3 days." |
| | | (iv)  Defendant WILLIAMS sent a text message to Business Owner #2, stating: "12 is perfect." |
| | | (h)  On or about September 10, 2013, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS receiving further valuable benefits from Business Owner #2: |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (i)  Defendant WILLIAMS sent a text message to Business Owner #2, stating "If it is still possible for [an associate of Business Owner #2's]...early Thursday November 7 until the evening of Sunday November 10th works best for me to go to Vegas."<br><br>(ii)  Defendant Williams received a text message from Business Owner #2, stating "ok I will check with him and make reservations and let [Business Owner #3] know."<br><br>(i)  On or about October 31, 2013, defendant WILLIAMS sent a text message to Business Owner #2, stating: "We still have December 2nd through December 6th blocked," referring to the anticipated Las Vegas trip.<br><br>(j)  On or about November 8, 2013, defendant WILLIAMS received a text message from Business Owner #2, asking: "is December 3-5 still good for vegas for u guys?"<br><br>(k)  On or about November 14, 2013, defendant WILLIAMS exchanged the following text messages with Business Owner #2:<br><br>(i)  Defendant WILLIAMS sent Business Owner #2 a text message, asking: "My secretary asked me about the flight info going to Vegas with the [Business Owner #2's] family....have you decided yet?" |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (ii) Defendant WILLIAMS received a text message from Business Owner #2, stating: "I just emailed it to you." |
| | | (l) On or about November 26, 2013, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #2: |
| | | (i) Defendant WILLIAMS sent Business Owner #2 a text message, stating: "Dude....I never want to feel like a drag on your wallet...but we are ALWAYS ready for an adventure." |
| | | (ii) Defendant WILLIAMS and Business Owner #2 exchanged text messages about Business Owner #2 arranging a trip for defendant WILLIAMS and Person #2 to Las Vegas and, in the midst of that exchange, defendant WILLIAMS sent a text message to Business Owner #2, stating "I would love to take [defendant WILLIAMS's family members] to see your house and zoo in San Diego before you sell your house." |
| | | (iii) Defendant WILLIAMS received a text message from Business Owner #2, stating: "ok. that sounds good." |
| NINE | On or about December 3, 2013, defendant WILLIAMS and Person #2 traveled from Philadelphia to Las Vegas, Nevada using airline tickets provided by Business Owner #2. | (a) From in or about January 2014 to at least in or about December 2015, in Philadelphia, defendant WILLIAMS and Person #2 continued to use the pre-owned Jaguar provided by Business Owner #2. |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | (b) On or about May 1, 2014, defendant WILLIAMS sent a text message to Business Owner #2, stating: "You can breathe easy now…I finally transferred title of the JAG today!" |
| | | (c) On or about May 3, 2014, defendant WILLIAMS sent a text message to Business Owner #2, stating: "We got more stuff done to the Jag, and drive it to DC for my Army Reserve Unit…it did very well on the highway. Thanks again!" |
| | | (d) On or about May 30, 2014, in Philadelphia, defendant WILLIAMS received a text message from Business Owner #2 referring to a letter from defendant WILLIAMS to the CDABC, asking: "hey seth, can you get that letter to me by Monday evening?" |
| | | (e) On or about June 2, 2014, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS issuing a letter under his authority as District Attorney concerning a then-pending proceeding before the CDABC: |
| | | (i) Defendant WILLIAMS received a text message from Business Owner #2, asking: "hey seth, can you try to get that letter done today ? thanks." |
| | | (ii) Defendant WILLIAMS sent Business Owner #2 a text message, asking: "Are you near a computer? Can you resend it to [defendant |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | WILLIAMS's personal email address]."<br><br>(iii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "sent."<br><br>(iv)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "if your bringing [your family members] out to sd this summer, let me know when so we can make arrangements."<br><br>(v)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "I scanned the letter and emailed it to you."<br><br>(vi)  Defendant WILLIAMS received text messages from Business Owner #2, stating: "thank you," and "I will let you know when I get it."<br><br>(f)  On or about June 2, 2014, in Philadelphia, defendant WILLIAMS gave Business Owner #2 a letter on official DAO letterhead, bearing defendant WILLIAMS's signature as "District Attorney," and addressed to a hearing examiner at the CDABC, stating, among other things:<br><br>• "I have personally known and worked with [Business Owner #2] for almost a decade and wanted to write this letter for his hearing";<br><br>• "[Business Owner #2] served on my transition team and currently serves as one of my Special Advisors"; |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | • "I am fully aware of [Business Owner #2's] conviction in 2010 and do not believe this to be a crime of moral turpitude and there was no financial loss to the government nor any individual citizen";<br><br>• "I Understand this hearing is to determine whether or not [Business Owner #2] can continue as an officer and stock holder of [Business Owner #2's California corporate entity], a California corporation which holds a liquor license";<br><br>• "The Commonwealth of Pennsylvania has ruled that [Business Owner #2] may rejoin [Business Owner #2's] company in our state, where he also holds a liquor license";<br><br>• "I believe that both of our states have similar laws about moral turpitude";<br><br>• "You may find it persuasive that after an investigation, the Pennsylvania Liquor Control Board ruled in [Business Owner #2's] favor, and restored [Business Owner #2] to all of the rights and privileges that [Business Owner #2] enjoyed previously."<br><br>(g)  On or about June 3, 2014, defendant WILLIAMS sent Business Owner #2 a text message, stating: "Camp ends August 8th for my [family |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | members]. So August 9th -16 would be the best times for us to visit San Diego." |
| TEN | On or about August 9, 2014, defendant WILLIAMS and two of his family members traveled from Philadelphia to San Diego, California, using airline tickets provided by Business Owner #2. | (a)  On or about August 16, 2014, defendant WILLIAMS exchanged the following text messages with Business Owner #2 regarding defendant WILLIAMS' August 9, 2014, San Diego trip and the prospect of receiving further valuable benefits from Business Owner #2:<br><br> (i)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "Thanks for everything! We had a great time!"<br><br> (ii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "your welcome. anytime. is was a pleasure hanging out with you guys."<br><br> (iii)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "We can't thank you and [Business Owner #3] enough for your generosity!!!"<br><br> (iv)  Defendant WILLIAMS received text messages from Business Owner #2, stating: "that's what friends do" and "Anytime you want to visit is ok with us."<br><br> (v)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "We will take you up on that."<br><br>(b)  On or about November 1, 2014, defendant WILLIAMS exchanged the |

| COUNT | TRAVEL OR USE OF FACILITY IN INTERSTATE AND FOREIGN COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | following text messages with Business Owner #2 regarding defendant WILLIAMS receiving further valuable benefits from Business Owner #2: |

(i)  Defendant WILLIAMS sent Business Owner #2 a text message, asking: "Can we use some of your points again this spring so I can fly [defendant WILLIAMS's family members and Person #2] and I to Key West! We can stay at my friends house for free...March 22-29? I would greatly appreciate it."

(ii)  Defendant WILLIAMS received text messages from Business Owner #2, stating: "yes."

(c)  On or about November 12, 2014, defendant WILLIAMS exchanged the following text messages with Business Owner #2:

(i)  Defendant WILLIAMS sent Business Owner #2 a text message, asking: "What does your badge say."

(ii)  Defendant WILLIAMS received a text message from Business Owner #2, , which included a photograph of a badge, replying: "district attorney special advisor."

(iii)  Defendant WILLIAMS sent Business Owner #2 a text message, replying: "Fancy."

| ELEVEN | On or about March 22, 2015, defendant WILLIAMS and two of his family members traveled from Philadelphia, through Atlantic City, New Jersey, to Fort Lauderdale, Florida, using airline tickets provided by Business Owner #2. | (a) On or about March 30, 2015, in Philadelphia, defendant WILLIAMS exchanged the following text messages with Business Owner #2, addressing defendant WILLIAMS's personal financial problems and arranging to meet with and receive a cash payment from Business Owner #2. |
|---|---|---|
| | | (i) Defendant WILLIAMS sent Business Owner #2 a text message, stating: "I came home and gave [Person #2] a chck for $748...the car plus $130 for clothes [Person #2] got [for defendant WILLIAMS's family member]." |
| | | (ii) Defendant WILLIAMS received from Business Owner #2 a text message, asking: "so what time will you drive by my house." and |
| | | (iii) Defendant WILLIAMS received from Business Owner #2 a text message, stating: "I only need a minute," and asking defendant WILLIAMS to bring with him a copy of the "car rental contract" from defendant WILLIAMS's recent Florida vacation. |
| | | (iv) Defendant WILLIAMS sent Business Owner #2 a text message, asking: "What is your exact address I will type it into my GPS and let you know." |
| | | (v) Defendant WILLIAMS received from Business Owner #2 a text message listing Business Owner #2's Philadelphia address. |
| | | (vi) Defendant WILLIAMS sent Business Owner #2 text messages, stating: "14 minutes" and "Be there in 2 minutes so come down." |

(vii)  Defendant WILLIAMS received from Business Owner #2 a text message, stating: "ok."

(viii)  Defendant WILLIAMS sent Business Owner #2 text messages, stating: "Thank you very much for helping," and "I'm still actually in shock," and "That helped out me right over if she cashes her check."

(ix)  Defendant WILLIAMS received from Business Owner #2 a text message, stating: "good."

(b)  On or about March 30, 2015, in Philadelphia, defendant WILLIAMS accepted a cash payment of at least approximately $500 from Business Owner #2.

(c)  On or about March 30, 2015, defendant WILLIAMS deposited $500 in cash into his personal account at a financial institution in Philadelphia.

(d)  On or about June 1, 2015, defendant WILLIAMS exchanged the following text messages with Business Owner #2, addressing defendant WILLIAMS's personal financial problems and arranging to meet with and receive a cash payment from Business Owner #2:

(i)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "I need your help regarding a personal matter...will you be able to meet me briefly tomorrow ?"

(ii)  Defendant WILLIAMS received from Business Owner #2 a text message, stating: "what time were you

thinking or I can meet you today or tonight at anytime. if you need me to, I can come to you."

(iii)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "I may call you from a random pay phone tonight."

(iv)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "My problems stem from [Person #2] not helping with utility bills but enjoying heat, electricity, cable, water and food."

(e)  In or about early June 2015, following the text messages referenced in Subsequent Acts (d) of this Count, in Philadelphia, defendant WILLIAMS accepted a cash payment of approximately $400 from Business Owner #2.

(f)  On or about July 8, 2015, defendant WILLIAMS sent Business Owner #2 a text message, stating: "I got the police report today."

(g)  On or about July 25, 2015, defendant WILLIAMS exchanged the following text messages with Business Owner #2:

(i)  Defendant WILLIAMS received a text message from Business Owner #2, asking: "did you get the police report for [Person #3]?"

(ii)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "Yes I have it."

37

(iii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "ok. if [defendant WILLIAMS's secretary] has a copy can I call her on Monday and have her email it to me."

(iv)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "The truth is I could get into serious trouble if I called that company and told them to pay [Person #3] $400."

(v)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "They would claim the fact that I even suggested them to take care of the damaged they caused would be me using my position to threaten them."

(vi)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "yea. Don't send the letter just get the police report if you could."

(vii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "I wasn't going to give him the letter I was just going to talk to [Person #3] and tell [Person #3] it's not worth it. but the police report isn't a problem is it?"

(viii)  Defendant WILLIAMS received a text message from Business Owner #2, stating: "I think [Person #3] needs that for his insurance company."

(ix)  Defendant WILLIAMS sent Business Owner #2 a text message, stating: "The police report is fine."

(x)  Defendant WILLIAMS received a text message from Business Owner



|  |  | #2, stating: "ok yea. just email me that. I will take care of the rest." |
|---|---|---|
|  |  | (xi) Defendant WILLIAMS sent Business Owner #2 text messages regarding Person #3 and defendant WILLIAMS's debt to Business Owner #2, stating: |
|  |  | • "I wish I could help more. I really like [Person #3] and [Person #3's associate]"; |
|  |  | • "As you know. I hate to let people down"; |
|  |  | • "Can I be a greeter or celebrity bartender to work off my debt to you and [Business Owner #3]? LOL"; and |
|  |  | • "No. I was serious about just doing whatever I can to help you guys!" |

In violation of Title 18, United States Code, Section 1952(a)(3) and Section 2.

## COUNT TWELVE
### (Obstructing and Affecting Interstate and Foreign Commerce by Extortion Under Color of Official Right)

1.     Paragraphs 1 to 8 of Counts Seven to Eleven of this Indictment are incorporated here.

2.     At all times relevant to Count Twelve of this Indictment:

a.     Business Owner #2 traveled and paid for goods and services in interstate and foreign commerce. Business Owner #2 also owned and operated bars in Philadelphia, Pennsylvania and San Diego, California, which were businesses engaged, and who purchased goods and services, in interstate commerce.

3.     From in or about July 2010 to in or about July 2015, in the Eastern District of Pennsylvania, and elsewhere, defendant

### RUFUS SETH WILLIAMS

did knowingly and willfully obstruct, delay, and affect interstate commerce, and attempt so to do, by extortion under color of official right – that is, by agreeing to obtain and obtaining money and other things of value from Business Owner #2, with consent, in exchange for defendant WILLIAMS's exercise of, and agreement to exercise, official authority and influence as specific opportunities arose, including with respect to:

a.     Appointing Business Owner #2 as Special Advisor to the DAO, to include: (a) defendant WILLIAMS issuing an official DAO badge and leather badge holder for Business Owner #2; (b) defendant WILLIAMS issuing a letter his capacity as the District Attorney, issued in or about May 2013 and back-dated to November 30, 2012, appointing Business Owner #2 to, and outlining official responsibilities for, the position of Special Advisor to the DAO; and (c) defendant WILLIAMS assigning, and agreeing to assign, certain matters to Business Owner #2 in Business Owner #2's capacity as Special Advisor to the DAO;

40

        b.     Issuing a letter in his capacity as the District Attorney to the CDABC to influence a then-pending proceeding before the CDABC to determine whether or not Business Owner #2 could continue as an officer and stock holder of a business entity that held a California liquor license; and

        c.     Obtaining an official police accident report for, and providing it to, Business Owner #2 related to a car accident involving Person #3.

        In violation of Title 18, United States Code, Sections 1951(a) and (b)(2) and Section 2.

## COUNTS THIRTEEN THROUGH SEVENTEEN
### (Scheme to Defraud the City and County of Philadelphia and its Citizens of Defendant WILLIAMS's Honest Services)

1.  Paragraphs 1 to 8 of Counts One to Five and Counts Seven to Eleven of this Indictment are incorporated here.

2.  At all times relevant to Counts Thirteen to Seventeen of this Indictment, the DAO, the City and County of Philadelphia, and the citizens of the City and County of Philadelphia had an intangible right to the honest services of their employees and elected public officials. As District Attorney for the City and County of Philadelphia, defendant WILLIAMS owed the City and citizens of Philadelphia a duty to, among other things, refrain from receiving bribes and kickbacks in exchange for defendant WILLIAMS's official action and influence, and for violating his duties as District Attorney.

3.  At all times relevant to Counts Thirteen through Seventeen of this Indictment, defendant WILLIAMS and/or the City of Philadelphia electronically transmitted, or caused to be transmitted, SFIs to computer servers in Dallas, Texas operated by a data company (the "Data Company"), which contracted with the City of Philadelphia to facilitate the filing of SFIs.

4.  From in or about July 2010 to in or about January 2017, in the Eastern District of Pennsylvania, and elsewhere, defendant

### RUFUS SETH WILLIAMS

and others knowingly and intentionally did devise and intend to devise a scheme and artifice to defraud the DAO, the City and County of Philadelphia, and its citizens of the right to defendant WILLIAMS's honest services as the District Attorney for the City and County of Philadelphia by means of materially false pretenses, representations, and promises.

42

5.      The purpose of this scheme and artifice to defraud was for defendant WILLIAMS to deprive the DAO, the City and County of Philadelphia, and its citizens of the honest services of defendant WILLIAMS through deceit and trickery; namely by accepting and agreeing to accept a stream of concealed bribes and kickbacks (a) from Business Owner #1 in exchange for defendant WILLIAMS's official action and influence, and for violating his official duties, in matters relating to (i) a criminal case and matter under investigation by the DAO related to Person #1; and (ii) security screening of Business Owner #1 by law enforcement authorities at the United States border when Business Owner #1 was attempting to return to the United States after foreign travel; and (b) from Business Owner #2 in exchange for defendant WILLIAMS's official action and influence, and for violating his official duties, in matters relating to (i) the appointment of Business Owner #2 as Special Advisor to the DAO; (ii) the CDABC's determination of whether or not Business Owner #2 could continue as an officer and stock holder of a business entity that held a California liquor license; and (iii) an official police accident report related to a car accident involving Person #3.

6.      On or about the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud, defendant

### · RUFUS SETH WILLIAMS

and co-schemers knowingly and intentionally transmitted and caused to be transmitted in interstate and foreign commerce by means of wire, radio, and television communications certain writings, signs, signals, pictures, and sounds as set forth below:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|---|
| THIRTEEN | January 30, 2012 | Email communication from Business Owner #1, in the Eastern District of Pennsylvania, to representatives of the Punta Cana Resort, in Punta Cana, Dominican Republic, for the purpose of confirming that defendant WILLIAMS's and Person #2's trip to the Punta Cana Resort would be on February 1, 2012, through February 5, 2012, and booking rooms at the Punta Cana Resort, including the "presidential suite in Royal Service," for defendant WILLIAMS and Person #2. |
| FOURTEEN | February 24, 2012 | Electronic transmittal from a furniture store in Philadelphia to a Delaware corporation with processing facilities in Nebraska and Arizona of a credit card payment of approximately $3,212 by Business Owner #1 for a custom sofa for defendant WILLIAMS. |
| FIFTEEN | March 12, 2013 | Email communication in interstate commerce received by defendant WILLIAMS and members of his security detail sent by a DAO employee in Philadelphia with the subject line "Schedule," attaching a schedule that listed "Meeting with [Police Official #1], [a social club in Philadelphia], per DA," on March 15, 2013, and arranging transportation for such meeting. |
| SIXTEEN | June 7, 2013 | Electronic transmittal of defendant WILLIAMS's 2012 City SFI by the City of Philadelphia to computer servers operated by the Data Company in Dallas, Texas, which omitted reference to benefits that defendant WILLIAMS received from Business Owner #1 and Business Owner #2 during the 2012 calendar year. |
| SEVENTEEN | November 17, 2014 | American Express credit card transaction in interstate commerce by Business Owner #2, who was in Philadelphia, to book Spirit airline tickets for defendant WILLIAMS and his family members for travel on or about March 22, 2015, from Atlantic City, New Jersey to Fort Lauderdale, Florida. |

In violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS EIGHTEEN TO TWENTY-THREE
### (Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraph 1 of Counts One to Five of this Indictment is incorporated here.

2.     At all times relevant to Counts Eighteen to Twenty-Three of this Indictment:

a.     There was an individual who was defendant WILLIAMS's relative ("Williams's Relative").

b.     There was a nursing home in Pennsylvania where Williams's Relative resided beginning in or about February 2012 (the "Nursing Home").  During in or about 2012, after Williams's Relative's admission to the Nursing Home, Williams's Relative still was receiving income in the form of pension and Social Security income, which was being deposited into a joint bank account that Williams's Relative shared with defendant WILLIAMS. Defendant WILLIAMS signed admission agreements with the Nursing Home confirming that, as the "Responsible Person" for Williams's Relative, he had access to Williams's Relative's income and that he would apply this income to the costs of Williams's Relative's care.  Further, defendant WILLIAMS represented and agreed to use Williams's Relative's income only for Williams's Relative and not for defendant WILLIAMS's own personal benefit.

c.     There were two individuals who were longtime friends of Williams's Relative (the "Friends").

3.     From in or about February 2012 to in or about November 2013, in the Eastern District of Pennsylvania, defendant

**RUFUS SETH WILLIAMS**

45

knowingly and intentionally did devise and intend to devise a scheme and artifice to defraud the Nursing Home and the Friends, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

        4.    It was part of the scheme that:

        a.    During in or about 2012, instead of applying Williams's Relative's income to the Nursing Home as he had agreed, defendant WILLIAMS diverted a total of approximately $10,319 of Williams's Relative's income for his own personal benefit, through cash withdrawals and his payment of personal expenses, including his mortgage and electrical services at his home. To conceal his diversion of these funds, in or about May 2012, defendant WILLIAMS falsely represented to employees of the Nursing Home that Williams's Relative – and not defendant WILLIAMS – was the one spending Williams's Relative's pension and Social Security income instead of forwarding such income to the Nursing Home.

        b.    In or about October 2013, the Friends provided a check for $10,000 to Williams's Relative to help defray Williams's Relative's expenses at the Nursing Home. This check was payable to defendant WILLIAMS, who deposited the check into his account at a financial institution in Philadelphia. Although he knew that this money was intended for Williams's Relative's care at the Nursing Home, defendant WILLIAMS spent the entire $10,000 for his own personal benefit, including through cash withdrawals, restaurant expenses, and his payment of personal expenses, including mortgage payments and tuition.

        5.    On or about the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud, defendant

**RUFUS SETH WILLIAMS**

46

knowingly and intentionally transmitted and caused to be transmitted in interstate commerce by

means of wire, radio, and television communications certain writings, signs, signals, pictures,

and sounds as set forth below:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|---|
| EIGHTEEN | May 30, 2012 | Electronic transmission in interstate commerce, by a mortgage company in Bryn Mawr, Pennsylvania, of image of check in the amount of $500, written by defendant WILLIAMS, using funds from Williams's Relative's pension and Social Security income that was due to the Nursing Home. |
| NINETEEN | August 10, 2012 | Electronic transmission in interstate commerce, by a mortgage company in Bryn Mawr, Pennsylvania, of image of check in the amount of $564, written by defendant WILLIAMS, using funds from Williams's Relative's pension and Social Security income that was due to the Nursing Home. |
| TWENTY | September 11, 2012 | Electronic transmission in interstate commerce, by a mortgage company in Bryn Mawr, Pennsylvania, of image of check in the amount of $570, written by defendant WILLIAMS, using funds from Williams's Relative's pension and Social Security income that was due to the Nursing Home. |
| TWENTY-ONE | October 30, 2013 | Electronic transmission in interstate commerce, by a mortgage company in Bryn Mawr, Pennsylvania, of image of check in the amount of $2,324.71, written by defendant WILLIAMS, using funds provided by the Friends that were intended for Williams's Relative's care at the Nursing Home. |
| TWENTY-TWO | November 7, 2013 | Electronic transmission of check card transaction in the amount of $117.90 by defendant WILLIAMS at a supermarket while vacationing in St. Michaels, Maryland to defendant WILLIAMS's PFCU account in Philadelphia, using funds provided by the Friends that were intended for Williams's Relative's care at the Nursing Home. |

| TWENTY-THREE | November 8, 2013 | Electronic transmission of check card transaction in the amount of $170.88 by defendant WILLIAMS at a restaurant while vacationing in St. Michaels, Maryland to defendant WILLIAMS's PFCU account in Philadelphia, using funds provided by the Friends that were intended for Williams's Relative's care at the Nursing Home. |
| --- | --- | --- |

In violation of Title 18, United States Code, Section 1343 and Section 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Sections 1343, 1951 and 1952, set forth in this Indictment, defendant

### RUFUS SETH WILLIAMS

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constituted and was derived from proceeds traceable to the commission of such offenses, including, but not limited to, approximately $54,465.48, representing the sum of approximately $34,145.52 worth of bribe proceeds and approximately $20,319.96 worth of fraud proceeds.

2.      If any of the property subject to forfeiture, as a result of any act or omission of defendant WILLIAMS:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

49

property of defendant WILLIAMS up to the value of the property subject to forfeiture.

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C).

A TRUE BILL:

_____

FOREPERSON

JEFF B. SESSIONS
Attorney General of the United States

WILLIAM E. FITZPATRICK
Acting United States Attorney
for the District of New Jersey
Acting Under Authority Conferred by 28 U.S.C. § 515