**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 17-137 |
| RUFUS SETH WILLIAMS | : | |

**GOVERNMENT'S MOTION TO ADMIT EVIDENCE
PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)**

The government moves pursuant to Federal Rule of Evidence 404(b) to admit at trial evidence that in 2008 and 2009, while successfully campaigning for the office of District Attorney for the City and County of Philadelphia, defendant Rufus Seth Williams was challenged and sanctioned for violating campaign finance and financial disclosure laws. These laws are the same provisions relevant to Counts 22 to 25 of the superseding indictment in this matter, charging a fraud on his political action committee through violation of these laws. The evidence also is related to Williams' obligation to file Statements of Financial Interest relevant to his campaigns, which he did not do in concealing the bribes alleged in the superseding indictment (Counts 1 to 15). The evidence regarding the 2008 and 2009 affairs is thus probative to a critical fact, which is Williams' knowledge of the laws and obligations in question.

In this memorandum, the government, in an abundance of caution, also provides notice of relevant evidence it will offer regarding additional acts of the defendant outside

those charged in the superseding indictment, but which is not subject to Rule 404(b) because the evidence cannot show bad character or propensity and instead provides ordinary evidence of knowledge. The evidence includes: (a) proof that, as the Inspector General of the City of Philadelphia between 2005 and 2008, Williams enforced against others the same rules regarding the use of City vehicles that he is charged in this case with violating for his personal benefit; and (b) proof that, as the District Attorney, he enforced against others the same state bribery law he is charged in this case with violating.[1]

## I.     BACKGROUND.

On March 21, 2017, the grand jury returned an indictment in this matter. The indictment focused on three alleged schemes: (a) an arrangement with Business Owner #1, from in or about July 2010 to in or about May 2015, in which Williams, while serving as the elected District Attorney for the City and County of Philadelphia, accepted bribes (in the form of travel, money, and other things of value) in exchange for performing and agreeing to perform official acts and to violate his legal duties on behalf of Business Owner #1; (b) an arrangement with Business Owner #2, from in or about March 2012 to in or about July 2015, in which Williams accepted bribes (in the form of airline tickets,

---

[1]  The evidence described herein as non-propensity, and not subject to Rule 404(b), is illustrative and not intended to be exhaustive. The government reserves the right to introduce relevant evidence, not charged in the superseding indictment, of Williams' lawful experiences that are probative of his knowledge and intent, including prior activity in which he participated as a public official.

money, an automobile, and other things of value) in exchange for performing and agreeing to perform official acts and to violate his legal duties on behalf of Business Owner #2; and (c) a scheme to defraud a nursing home, where Williams' relative resided, and friends of that relative, by diverting to his own use pension and Social Security income of the relative, as well as a $10,000 gift the relative received from the friends to pay nursing home expenses, all of which Williams was obligated to transfer to the nursing home, but instead converted to his own use.

On May 9, 2017, the grand jury returned a superseding indictment. Williams is now charged with 11 counts of travel and use of interstate facilities to promote and facilitate bribery contrary to Pennsylvania law (the "Travel Act counts"), in violation of 18 U.S.C. § 1952(a)(3); two counts of Hobbs Act extortion under color of official right, in violation of 18 U.S.C. § 1951; two counts of honest services wire fraud, in violation of 18 U.S.C. § 1346; 12 counts of wire fraud, in violation of 18 U.S.C. § 1343; and two counts of mail fraud, in violation of 18 U.S.C. § 1341.

The superseding indictment alleges two additional fraudulent schemes: (a) a scheme to defraud his political action committee, Friends of Seth Williams, a/k/a "The Committee to Elect Seth Williams," by using funds of the PAC for personal expenditures; and (b) a scheme to defraud the City of Philadelphia and the federal HIDTA program by extensively using vehicles owned or leased by these government entities for personal purposes, in violation of the entities' explicit rules.

Specifically, with regard to matters pertinent to this memorandum, the superseding indictment alleges as follows.

- 3 -

A.      **Bribery Allegations.**

Counts 1 to 6 and 14 to 15 of the superseding indictment allege that Williams engaged in a corrupt bribery scheme with Business Owner #1, from in or about May 2010 to in or about May 2015, in which Business Owner #1 provided Williams with benefits in exchange for official action. Those benefits included a Louis Vuitton tie worth approximately $205; an iPad worth approximately $300; an all-expense paid trip to a resort in Punta Cana, Dominican Republic (the "Punta Cana Resort"), costing more than $6,000; a custom sofa worth approximately $3,212; a $502 dinner; a $7,000 check and $2,000 in cash; and a Burberry watch for defendant Williams, a Burberry purse for Williams' girlfriend, and meals and other valuable benefits for Williams and his girlfriend. Williams filed City and State Statements of Financial Interest ("SFIs") for the reporting years 2012 and 2013 that intentionally omitted reference to valuable benefits received in those years by Williams from Business Owner #1 in order to conceal Williams' unlawful arrangement with Business Owner #1. In 2016, well after the federal law enforcement investigation had become known to him, Williams filed amended City and State SFIs, reporting his receipt of a number of valuable benefits, including many of the benefits that he received from Business Owner #1.

Counts 7 to 15 of the superseding indictment allege that Williams engaged in a corrupt bribery scheme with Business Owner #2, from in or about March 2012 to in or about July 2015, in which Business Owner #2 provided Williams with benefits in exchange for official action. Those benefits included a pre-owned 1997 Jaguar XK8 convertible, worth approximately $4,160, and the value of insurance premiums paid by

Business Owner #2 through in or about November 2013; cash payments totaling at least $900; and numerous airline tickets for Williams, his girlfriend, and/or other family members, as well as lodging, on multiple trips to California, Florida, and Nevada. Williams filed City and State SFIs for the reporting years 2012 through 2015 that intentionally omitted reference to valuable benefits received in those years by Williams from Business Owner #2 in order to conceal Williams' unlawful arrangement with Business Owner #2. In 2016, well after the federal law enforcement investigation had become known to him, Williams filed amended City and State SFIs, reporting his receipt of a number of valuable benefits, including many but not all of the benefits that he received from Business Owner #2. In January 2017, Williams entered into a settlement agreement with the Philadelphia Board of Ethics (the "Board") in which Williams represented that, except for his receipt of additional valuable benefits set forth in that agreement, the information in his amended City SFIs was accurate and complete in all material respects.  However, Williams' amended City and State SFIs and his settlement agreement with the Board still failed to report Williams' receipt of the pre-owned 1997 Jaguar XK8 convertible and payment of insurance premiums from Business Owner #2.

### B.    PAC Fraud.

In Counts 22 to 25, Williams is charged with committing a fraud against his PAC from in or about August 2010 to in or about August 2016, by using its funds for personal expenditures in violation of applicable law.

The superseding indictment explains that the Commonwealth of Pennsylvania's Campaign Finance Reporting Law, P.L. 1333, No. 320, 25 P.S. § 3241 *et seq.*, and the

Pennsylvania Election Code, 4 P.S. § 177.1, permitted the expenditure of PAC funds only to influence the outcome of an election, and not for personal purposes. Further, the indictment states, these laws required Williams, as a candidate, to file Campaign Finance Reports ("CFRs") that disclosed the PAC's expenditures and receipt of contributions.

The indictment alleges that Williams violated these rules by, in part, taking approximately $4,136.59 from the PAC between August 2010 and September 2010, using a political consultant as a pass-through,[2] and also by charging to the PAC numerous personal expenditures he incurred at a social club and at a health club between October 2011 and May 2015. Those expenditures included thousands of dollars in charges for such matters as private dinners, massages, facials, and clothing.

The superseding indictment further asserts that from in or about 2011 to in or about 2016, Williams caused to be prepared and filed with the City the PAC's annual CFRs, in which, through the use of inaccurate descriptions and omissions of certain expenditures, he concealed the fact that he used PAC funds for his personal benefit, contrary to the Campaign Finance Reporting Law and the Pennsylvania Election Code.

### C.    Vehicle Fraud.

The superseding indictment alleges, in Counts 26 to 29, that Williams, from in or about December 2011 to in or about April 2017, used City and HIDTA vehicles under the false and fraudulent pretense that they were to be used only for a business purpose when

---

[2]  In January 2017, Williams entered into an agreement with the Board in which Williams agreed that he failed to disclose the $4,036.59 that he received from the political consultant in 2010 on Williams' 2010 SFI.

in fact he used such vehicles extensively for his own personal purposes, often also taking advantage of fuel provided by the City. To accomplish this, he directed his security detail to leave a City or HIDTA vehicle at his home every weeknight, so that he would have access to such a vehicle during all non-working hours, including weekends. During such non-working hours, Williams transported himself along with family members and other non-employees in City and HIDTA vehicles for non-official affairs. He drove himself, family members, and friends in City and HIDTA vehicles outside the City limits for purely personal purposes, including for a trip to a resort in Virginia.

These actions violated longstanding, written policies of the City, the District Attorney's Office, and HIDTA. In particular, the City and District Attorney policies "prohibited the use of City vehicles: (A) for personal or private reasons; (B) for personal errands other than in the most direct route between work and home; (C) while off-duty except for work-related activities; (D) for anything other than official city business; and (E) for travel outside City limits for anything other than legitimate business purposes." Superseding Ind. at p. 57.

## II.    EVIDENCE OF OTHER ACTS.

The government proffers the following evidence of other acts that are relevant to prove knowledge with respect to the charged offenses.

### A.    Knowledge of Campaign Finance Laws.

During his campaign for District Attorney in 2009, Williams was investigated and ultimately fined for making campaign expenditures from his PAC in violation of state

law. This evidence is highly probative of his knowledge of the same rules that he allegedly violated in committing the PAC fraud charged in the indictment. The evidence also provides clear proof of Williams' awareness of the financial disclosure laws which are pertinent to the bribery allegations in the indictment.

The evidence will be presented through Williams' own recorded testimony, as well as through the testimony of a representative of the Board, and of Aubrey Montgomery. From November 2008 to June 2009, Montgomery was the Finance Director of the Friends of Seth Williams, a/k/a "The Committee to Elect Seth Williams" ("the PAC"). Her duties included filing accurate and complete Campaign Finance Reports ("CFRs") and compliance with all applicable rules, including requiring proper documentation to support each PAC expenditure.

Before Montgomery joined the PAC, Williams handled everything related to the PAC's finances. Montgomery soon observed that Williams used both the PAC's debit card and his personal debit card to pay for expenses. Williams then sought reimbursement for PAC expenses paid with his personal debit card. Williams explained to Montgomery that Williams' wife reviewed bank statements for their joint account and sought reimbursement from Williams for all non-family expenditures. Williams then wrote PAC checks to his wife for reimbursements and his wife deposited these PAC checks into their joint account.

Early in Montgomery's tenure as Finance Director, she took the PAC debit card away from Williams. She also instituted strict procedures for anyone to obtain reimbursements from the PAC. At around this time, Montgomery observed that Williams

was under stress about his personal finances and that Williams occasionally used his mother's American Express card to pay some of his bills.

In February 2009, the Board began investigating the PAC for improper contributions and expenditures. In March 2009, persons associated with a campaign opponent of Williams sued to remove Williams from the ballot for District Attorney because Williams allegedly did not fully disclose PAC reimbursement checks as income on his SFI. The Court of Common Pleas removed Williams from the ballot, but this decision was reversed on appeal by Commonwealth Court, which held that: (1) campaign expenses initially paid by Williams and then reimbursed by the PAC were not income required to be reported on his SFI; and (2) even if reimbursement of campaign expenses was income required to be reported on his SFI, Williams was entitled to timely amend his SFI. *See In Re: Nominating Petition of R. Seth Williams*, 972 A.2d 32 (Pa. Cmwlth. 2009).

During his March 20, 2009, and March 23, 2009, testimony in this judicial matter, Williams made a number of statements indicating his knowledge of proper and improper PAC expenditures, as well as the disclosure requirements for SFIs. Williams also admitted that he intentionally wrote PAC reimbursement checks in his wife's name rather than his own. These statements included, but were not limited to, the following:

- I wrote my wife's name on reimbursement checks for expenditures that were made by my campaign, and I signed them on behalf of the campaign committee, and then used her name when I gave them to her for her to deposit…. It's a joint account. I thought it was a better practice to put her name on it.

- Your Honor, it was my understanding that I had to list all of the sources of income that I had [on the SFI], such as the law firms I've worked for that I received compensation from, the United States Army Reserves, teaching at Neumann College. And I also had to list boards I served on in a volunteer capacity. I also listed them so that the public could know what they are. And in reviewing the definition, and in looking at the Code, I thought that that satisfied everything that was income. So that's why – I even listed things that I even listed a pension from the City, and also a pension from the United States Army that I am not even eligible for unless I serve 20 years. I've only served 11, or ten-and-a-half now. But I even listed that just out of an abundance of caution just in case someone tried to argue that in the future I have some kind of entitlement to some sort of income from a pension. So I even listed that out of an abundance of caution, Your Honor.

- Yes, Your Honor. These [CFR entries] are all expenditures . . . that show reimbursements to members of my family as a result of expenses that were all campaign-related and generated by my desire to become District Attorney of Philadelphia.

- Your Honor, I [wrote notations on the credit card bill] consistent with whenever my mother or my wife showed me the American Express card and said, "Write down which things are from the campaign." And then I would write it, or I would highlight, as a practice, the campaign-related expenses, and then show that to the campaign so that my mother would be reimbursed for the expenses that were campaign-related.

- Your Honor, it was my state of mind that on March the 10th when I completed the first [SFI], that I was disclosing things in an abundance of caution that went beyond what was even asked. But, as a result of wanting to be even more transparent and wanting to be more, I guess – to more accurately express what those expenses were, I amended the document on Friday, March the 20th, as it appears here, and with the caveat in the last paragraph that I was attempting to answer it. And my understanding of income was, just out of, again, even a greater abundance of caution, just listed what is already public documents so that anybody – the objectors or anyone else could see what the expenses were and what was paid back.

Similarly, during his April 24, 2009 deposition testimony before the Board,

Williams made a number of statements indicating his knowledge of proper and improper

PAC expenditures, including, but not limited to, the following:

- Well, what you see here are when I used [my mother's] American Express card for campaign related lunches or event purposes, and when we received the bill, I'd write in my handwriting that it was campaign related. And, so, yes, they were reimbursed. Other things that were redacted might've been things that weren't campaign related that, you know, aren't relevant to the campaign. Things that were my mother's.

- I think one check I did [write a PAC check out to myself for reimbursement], and then it would appear to me that, you know, my wife would be asking me for the reimbursements, the campaign committee would reimburse her, so that she could go and deposit the checks at the bank, put into the family's account at a bank here our house. And so I thought that was the best policy of the protocol for us, as opposed to me depositing them to the family's bank account myself. And when I hired Ms. Montgomery, then we thought a better policy was for the campaign to have its own debit card. So, then we began making purchases, some of which the expenditures are here . . . are reflective of the use of the campaign committee's own debit card, so I would not have to use my own. We're always trying to find the best practice, the best policy to be more compliant.

- It is my understanding, and it's my desire to be as compliant with all of the state ethics rules, and whoever has rules about campaigning, raising money in campaigns, spending money, to be as transparent as possible.

- If you were to look through whichever one of these reflects expenditures, things for a fundraiser, a cook out, and we had to purchase plates, clearly when we would look at the Citizens Bank [statement], and we saw either the receipts or we saw the expense at Party Land or Dollar Tree, that those were for napkins and plates for a fundraising cook out that I used the debit card, my family's personal debit card, to make the purchase. So, it wasn't for my own cook out. It wasn't for my daughter's birthday. It was for the furtherance of the campaign itself. And it was those things that we had to seek reimbursement for, and the campaign committee thought were justifiable expenses of the campaign committee.

- I was only using my debit card . . . that's connected to my family's personal checking account, and maybe in June I had used the American Express card that was connected to my mother's account. So, we would look at the statements from either that American Express account, or online, or from the mailed Citizens Bank statements, we would see what, again, was consistent with what was a campaign expense. My knowledge of where I was, and what the expenses were, as opposed to, you know, taking my daughters for pizza. That was the personal, and going and taking a person

- 11 -

that I'm trying to get on the finance committee, or a person I'm trying to
get to support my candidacy to eat at the Devon Grill or at Twenty21, that
would be something that was specifically related to the campaign in the
furtherance of the candidacy.

- Again, as a result of looking at the Citizens Bank statement, and looking
  over that comparing, knowing what the expenses were. I don't go to
  Delmonico's on my own to eat. I don't go to Four Seasons. I don't go to the
  Palm, for the most part, no. Chop's Restaurant. I don't go to those places on
  my own. I would normally just go to like Taco Bell or something like that if
  I'm just going to get something to eat in a hurry, if I'm not eating at home.
  Any time I would go to make a reservation to go eat at one of these
  restaurants, it's because of something I'm trying to do to meet with
  someone in furtherance of the campaign, and then double check that with
  my recollection of where I was last Wednesday at lunch, knowing that I
  met with Council person "X," or, you know . . . someone. And then we can
  add those things up.

- Well, at the same time, my limited understanding of campaign finance
  laws, what I mean by that is you're always trying to be more compliant, and
  when you find that you've made an error, you refile and make a more
  knowing submission of what you find in facts to be. You understand? So –
  and also, you file, you have deadlines, but even if you miss the deadline,
  you still file, and you pay the fee, the fine, the $250 if you're like a week
  late or whatever it for the filing deadline. So, you're always trying to be
  more compliant, and, you know, when you've found that you made an
  error, you make that error known, and you try to fix it. You understand? So,
  I'm saying, I'm trying to be complete. If I were to find there were some big
  error from before, then we would file the document, you know, the next
  appropriate time, or as soon as possible, to become more compliant. So, to
  be as transparent as possible with all information that we have.

In May 2009, following Williams' primary win, he signed a settlement agreement

with the Board. In this agreement, Williams conceded that, in 2008, his PAC did not

maintain adequate documentation of expenditures for which Williams was reimbursed by

the PAC, and that the PAC mistakenly reported duplicate expenditures in its CFRs. The

Board ordered the PAC to pay fines and file amended CFRs.

Montgomery amended the PAC's annual CFRs for 2007 and 2008 in order to make corrections.  In so doing, she noticed that Williams charged the PAC for numerous expenditures which concerned her, such as a haircut and hotel stay during his military duty and in-room movies and meals at his hotel for the Democratic National Convention. Montgomery did not believe that Williams incurred these expenditures in furtherance of an election, as required under Pennsylvania campaign finance laws. When Montgomery confronted Williams about these "add-ons," Williams stated his belief that he was entitled to a "per diem" while traveling. Montgomery tried to dispel Williams of this notion, but Williams again billed the PAC for questionable expenses at the Pennsylvania Society meeting in New York City in December 2008. For that trip, Montgomery reserved Williams' hotel room on Montgomery's credit card but believed Williams would use his own credit card when he checked into the hotel. Instead, Williams charged the room, parking, in-room movies, and room service to her card. The PAC reimbursed Montgomery for parking and room charges, but Montgomery asked Williams to use his personal funds to repay her around $200 for the meals and movies. Williams never paid her and Montgomery grew weary of asking him for the money, so the PAC ultimately made her whole.

In late June 2009, Montgomery wrote a memo to Williams and a political consultant to address recent successes and concerns as the PAC transitioned to a new Finance Director. In this memo, Montgomery expressed her unease with Williams' involvement with directing PAC funds outside a budget and spending plan. Montgomery stated, in pertinent part:

This type of behavior was what triggered the ethical and political problems of the primary and my concern is that this pattern of spending is reemerging now that we are into the general election cycle. I think it is politically unwise to have the [PAC] covering out of state travel and meal reimbursements without there being serious political and fundraising opportunities attached to these excursions, especially while the committee is so deep in debt . . . . The candidate should have very limited access to campaign funds and disbursements to the candidate (or reimbursements made on his behalf) should be vetted before submission. It is my hope that expenditures are not challenged in the future and that we have the resources at the end of October to secure . . . victory.

**B.    Prosecution of Bribery.**

In 2014, in a highly publicized action, Williams as District Attorney took over an investigation of public corruption which the state Attorney General had determined to end without charges. In the matter, an informant working with the state Attorney General's Office gave cash (in amounts ranging from $750 to thousands of dollars) to state legislators, and also gave Thomasine Tynes, then the President Judge of the Philadelphia Traffic Court, a Tiffany's bracelet worth $2,000. At the time he brought charges against these officials, Williams made statements decrying their corrupt conduct, confirming his awareness of the same prohibitions which applied to his nearly identical (and much more lucrative) conduct charged in this case.

The pertinent evidence is not voluminous. We propose to introduce a handful of revealing statements William made. On October 23, 2014, Williams held a press conference, and we propose to introduce a video, less than two minutes in length, depicting portions of the news conference in which he described the charge against Judge Tynes and actually held up the Tiffany bracelet that Tynes received. He said, "This is a bracelet. It's a $2,000 Tiffany charm bracelet. The bracelet that Judge Tynes received for

promising special access to a businessman who said he was seeking an exclusive and very lucrative government contract." He added, "This is demonstrative, tangible evidence of the quid pro quo."

On March 10, 2015, in announcing charges against three of the legislators, he stated in a press release, "The citizens of the Commonwealth of Pennsylvania and the people of Philadelphia deserve nothing but honest and hardworking representation. They don't deserve elected officials who think that it is ok to sell their office . . . . There are no free passes when it comes to corruption and the elected officials who break the law . . . ."

### C.    Enforcement of City Vehicle Policy.

Between 2005 and 2008, Williams served as the Inspector General of the City of Philadelphia, whose duty it was to investigate and address corruption, fraud, misconduct, waste, and mismanagement by City employees. (He entered private practice in 2008; then campaigned for and won the office of District Attorney in 2009, and assumed office in January 2010.) On numerous occasions during his tenure as Inspector General, Williams investigated and reported City employees who violated the City's vehicle use policy, which was identical to the District Attorney's Office and City policies he would later wantonly violate while serving as District Attorney. These matters involved the improper personal use of City vehicles outside of working hours.

The pertinent records, obtained from the Inspector General's office, show that at times Williams himself was the investigator, writing up misuse of vehicles he personally witnessed, such as on the Fourth of July holiday in 2006, when he observed a city vehicle being driven in a residential neighborhood at 10:21 p.m.

These matters often resulted in a warning for a first offense, and more significant discipline for repeat offenders (such as a Streets Department employee who was suspended without pay for six days in 2006 after he was observed driving a city vehicle with child passengers – exactly the conduct in which Williams later repeatedly engaged with City vehicles as District Attorney).

Even after he left the position and went to work in private practice at a law firm, Williams remained attentive to the issue. On June 16, 2008, he sent an email to his former executive secretary at the Inspector General's office, which stated: "I can't stop myself. It is 8:40pm I am in the Lord & Taylor parking lot in Bala Cynwyd and a city owned minivan is here. The plate number is MG-4172D and the vehicle number is 075255."

## III.   ARGUMENT.

Evidence such as that described above is highly probative of the element of knowledge which the government must prove with respect to various counts in the superseding indictment.

### A.   Evidence Regarding the 2008-2009 Campaign Finance Issues is Relevant to Prove Knowledge Pertinent to the Bribery and PAC Fraud Allegations.

The gravamen of the PAC fraud charges in the indictment (Counts 22 to 25) is that Williams used PAC funds for personal expenses, in violation of applicable campaign finance laws. The proffered evidence of his experience before the Board of Ethics and Court of Common Pleas, the nature of those allegations, and statements that he made

about his understanding of campaign finance and financial disclosure laws are probative of his knowing violations of such laws and, therefore, his intent to defraud. His 2009 testimony, including statements such as: "So, it wasn't for my own cook out. It wasn't for my daughter's birthday. It was for the furtherance of the campaign itself," and "My knowledge of where I was, and what the expenses were, as opposed to, you know, taking my daughters for pizza. That was the personal, and going and taking a person that I'm trying to get on the finance committee, or a person I'm trying to get to support my candidacy to eat at the Devon Grill or at Twenty21, that would be something that was specifically related to the campaign in the furtherance of the candidacy," evinces explicit knowledge of the essential rule of Pennsylvania law that PAC funds may only be used to influence the outcome of an election, and not for personal purposes.

In a mail and wire fraud case such as this predicated on misuse of restricted funds, evidence of knowing violations of rules governing such funds is highly probative of a defendant's awareness of the rules and fraudulent intent. The decision in *United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011), is decisive on this point. There, the government alleged that a state Senator defrauded the Senate by spending public funds for personal benefit, in violation of the state's Ethics Act. The Third Circuit held that "the content and enforcement of the Ethics Act was clearly relevant to the Government's claim that there were rules that [defendant] Fumo broke repeatedly, that those rules were clear enough for him to understand, and to show that he was deceiving the Senate when he misrepresented or omitted aspects of his actions and expenditures to avoid the perception that he had violated those rules." *See also Genty v. Resolution Trust Corp.,* 937 F.2d 899, 908-09 (3d

Cir. 1991) ("When . . . liability is premised on violations of the federal mail fraud statute, 18 U.S.C. § 1341, the defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those larger objectives be achieved."); *United States v. Copple,* 24 F.3d 535, 545 (3d Cir. 1994) ("Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent.").

As with the Senate funds in *Fumo*, Williams' understanding of restrictions on PAC spending goes directly to his intent to defraud. Evidence regarding the 2009 campaign shows intimate knowledge regarding the pertinent campaign finance and financial disclosure laws, where Williams' compliance with those rules (or lack thereof) threatened his very participation as a candidate.

The proffered evidence also is probative of intent with respect to the bribery counts. To prove the Travel Act counts, the government must show that Williams solicited, accepted, or agreed to accept the benefits alleged "as consideration for" his decision, opinion, recommendation, vote, exercise of discretion as a public servant, or a violation of a known legal duty as public servant. *See* 18 Pa. C.S.A. § 4701(a). To prove the Hobbs Act and honest services counts, the government must show that Williams accepted things of value in exchange for official acts. The indictment alleges that Williams received benefits, and failed to disclose them on the required Statements of Financial Interest. Such a failure to disclose in the face of a known duty itself constitutes a misrepresentation for the purpose of the mail and wire fraud counts. *See*, *e.g.*, Third Circuit Model Criminal Jury Instructions, 6.18.1341-1 ("deceitful statements of half

truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements"). Further, a jury permissibly may infer such concealment evidence as manifesting a defendant's consciousness of guilt. *See United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) (finding sufficient evidence of intent given defendant's efforts to conceal scheme); *United States v. White*, 663 F.3d 1207, 1214 (11th Cir. 2011) ("the extent to which the parties . . . conceal their bribes is powerful evidence of their corrupt intent").

It is thus necessary to prove Williams' knowledge of the disclosure rules, which the 2008-2009 evidence amply accomplishes. As explained above, Williams addressed the provisions at length during sworn testimony, making statements such as, "Your Honor, it was my understanding that I had to list all of the sources of income that I had [on the SFI]"; "Your Honor, it was my state of mind that on March the 10th when I completed the first [SFI], that I was disclosing things in an abundance of caution that went beyond what was even asked"; and "It is my understanding, and it's my desire to be as compliant with all of the state ethics rules, and whoever has rules about campaigning, raising money in campaigns, spending money, to be as transparent as possible." All of the evidence described earlier provides essential proof of Williams' knowledge of the campaign finance and financial disclosure laws applicable to this case.

**B.      Evidence Regarding Williams' Investigations of Bribe-Taking and Improper Use of City Vehicles Provides Proof of Knowledge Pertinent to this Case.**

In the counts regarding the alleged vehicle fraud (Counts 26 to 29), the government alleges that Williams engaged in extensive personal use of City and HIDTA

- 19 -

vehicles, in violation of applicable policies of the City, the District Attorney's Office, and HIDTA. Evidence regarding his own enforcement of the same City vehicle policy as Inspector General provides unmistakable proof of his familiarity with the rules he is accused of systematically breaking.

With regard to the bribery allegations (Counts 1 to 15), the government intends to show that Williams was aware that the benefits were given to him in exchange for official action, and not under a mistaken impression about the purpose of those benefits. Evidence that he prosecuted others for violation of the state bribery statute, including a judge charged with accepting a $2,000 bracelet, demonstrates keen awareness and intent at the same time that he took similar and more valuable benefits from others as consideration for his opinion, recommendation, act of official discretion as the District Attorney, or violation of his known legal duty as a public servant, and in exchange for his official acts.

### C.    Rule 404(b) Does Not Apply to the Evidence Regarding Williams' Investigation and Prosecution of Others.

The evidence concerning Williams' prosecution of other bribe-takers, and his investigation of misuse of City vehicles, is not subject to Rule 404(b), and is addressed in this memorandum only in an abundance of caution. That rule provides:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial — or during trial if the court, for good cause, excuses lack of pretrial notice.

The rule bars "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Thus, the rule does not apply to evidence, when offered by the government against a criminal defendant, which proves *good character*, or otherwise cannot show that the defendant acted in conformity with character.

Thus, the evidence described here regarding the prosecution of bribe-takers, or the investigation of those impermissibly using city property, is not subject to Rule 404(b)(1). Such prosecutions and investigations are salutary actions. Further, the government is not asserting that Williams acted in conformity with the character he demonstrated in undertaking these prosecutions and investigations. Rather, the evidence is that Williams in the charged acts acted *inconsistently* with the rules he earlier enforced.[3]

---

[3] Thus, it is Williams who would not be permitted to offer the evidence of his previous prosecutions and investigations to prove his good character. *See, e.g., United States v. Hayes*, 219 F. App'x 114, 116 (3d Cir. 2007) (not precedential); *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) (evidence offered by defense of good deeds by political officials on other occasions excluded). A defendant may not defend against an allegation of crime by proving that on other occasions he acted lawfully. That would violate Rule 404(b) in presenting evidence of character to suggest that the defendant acted in conformity therewith. But this has nothing to do with admissibility where the government introduces evidence relevant to knowledge without any reference or relevance to character or propensity.

The evidence regarding earlier prosecutions of bribe recipients and investigations of misuse of city vehicles is offered here only to prove Williams' knowledge of the applicable laws and rules. The question, then, is whether the evidence is relevant, which it surely is. It is comparable to proof that Williams earlier took courses or gave talks regarding the applicable rules, which is unobjectionable proof.[4] The remaining question is whether any prejudicial impact of the evidence substantially outweighs the probative value, under Federal Rule of Evidence 403. It does not, as addressed later in this memorandum.

### D. Evidence Regarding Application of the Campaign Finance Laws in 2008-2009 is Admissible Under Rule 404(b).

With regard to the remaining evidence addressed in this memorandum, concerning Williams' earlier compliance with campaign finance laws (or lack thereof), much of that evidence as well is not subject to Rule 404(b). For instance, the PAC's former finance director, Aubrey Montgomery, should be permitted to testify that she instructed Williams regarding the applicable laws that are pertinent in this case. That would not be character evidence, simply direct evidence of relevant knowledge.

But the PAC evidence regarding the 2008-2009 period does show wrongful conduct, and therefore Rule 404(b) is applied. The evidence of knowledge it imparts is particularly powerful and probative, showing that Williams was exposed to the applicable

---

[4]   "Fed.R.Evid. 401 provides what is a very low threshold of relevancy: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Long*, 574 F.2d 761, 765 (3d Cir. 1978).

laws in a situation that posed a threat to his entire campaign, when a lower court acted to remove him from the ballot because of his noncompliance. Further, much of the evidence revealing Williams' knowledge of the campaign finance and financial disclosure laws appears in Williams' own deposition and court testimony. The context and import of this testimony cannot be understood without informing the jury of the reason he was testifying, that is, because the court and the Board were addressing complaints that Williams did not comply with the campaign finance and financial disclosure laws.

This is a textbook example of evidence that is admissible under Rule 404(b)(2) to prove the defendant's knowledge. Under Rule 404(b), evidence of extrinsic wrongful acts is admissible if these requirements are met: "(1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003), citing *Huddleston v. United States*, 485 U.S. 681 (1988).[5]

The essential limitation is that the evidence must not simply show propensity, that is, that the defendant committed a crime before and therefore must have done so again. Therefore, the proponent of evidence of prior acts "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that

---

[5] The Court of Appeals requires that the district court's "reasoning [with respect to the admissibility of 404(b) evidence] should be detailed and on the record." *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013). Where such a record is presented, review is for abuse of discretion, and the trial court's "ruling will rarely be disturbed." *United States v. Gatto,* 995 F.2d 449, 457 (3d Cir. 1993) (citations omitted).

the defendant has the propensity to commit the crime charged." *United States v. Morley*, 199 F.3d 129, 133 (3d Cir. 1999); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994).

Thus, Rule 404(b) was designed to set forth "a general rule of admissibility, subject to a single exception – evidence of other wrongful acts was admissible so long as it was not introduced *solely* to prove criminal propensity. Thus, the proponent no longer had to pigeonhole his evidence into one of the established common-law exceptions, on pain of exclusion. If he could identify *any* non-propensity purpose for introducing the evidence, it was admissible." *United States v. Green*, 617 F.3d 233, 244 (3d Cir. 2010) (emphasis in original). *See also United States v. Repak,* 852 F.3d 230, 241 (3d Cir. 2017) ("In sum, Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also 'inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted.").

The Third Circuit has spoken favorably of Rule 404(b) evidence on many occasions. One panel stated:

> We favor the admission of such evidence, "if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime." *United States v. Long*, 574 F.2d 761, 766 (3d Cir.), *cert. denied*, 439 U.S. 985 [] (1978); *see also United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir.1982), *cert. denied*, 462 U.S. 1134 [] (1983) . . . . "In weighing the probative value of evidence against the dangers . . . in Rule 403, the general rule is that the balance should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir.1980).

*United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999). *See also United States v. DeMuro*, 677 F.3d 550, 563 (3d Cir. 2012) (Rule 404(b) "is inclusive, not exclusive, and

emphasizes admissibility.") (*quoting United States v. Sampson,* 980 F.2d 883, 886
(1992)); *United States v. Daraio*, 445 F.3d 253, 263 (3d Cir. 2006) (confirming that
admission of 404(b) evidence is favored); *cf. United States v. Caldwell,* 760 F.3d 267,
276 (3d Cir. 2014) (this "does not suggest that prior offense evidence is presumptively
admissible."). The Supreme Court confirmed the Third Circuit's view, stating: "Congress
was not so nearly concerned with the potential prejudicial effect of Rule 404(b) evidence
as it was with ensuring that restriction would not be placed on the admission of such
evidence." *Huddleston v. United States*, 485 U.S. 681, 688-89 (1988).

      Here, with regard to the PAC evidence, the government does not rely on any
propensity link, that is, an assertion that Williams committed an offense before and
therefore must have done so again. Rather, the evidence is offered to show knowledge,
and the chain of reasoning is free of any reference to propensity: Williams was exposed
to and admitted explicit knowledge of the campaign finance rules – particularly the
prohibition of personal use of PAC funds, and the requirements of financial disclosure –
when he was accused of and addressed such conduct in 2009, and therefore he was aware
of these rules at the time of the charged offenses several years later. (To be sure, the
evidence could be used to suggest propensity; that is true of virtually any evidence
properly offered under Rule 404(b) to prove a non-propensity point. The cure for that,
addressed below, is a proper jury instruction directing the jury to ignore any propensity
inference.)

      The Third Circuit's recent en banc decision in *Langbord v. United States Dep't of
Treasury*, 832 F.3d 170 (3d Cir. 2016), *cert. denied,* 2017 WL 1366730 (U.S. Apr. 17,

2017), approved the admission of 404(b) evidence for virtually an identical purpose to that offered here. In that matter, the government asserted its ownership of 10 extraordinarily valuable gold coins that were stolen from the U.S. Mint in Philadelphia in the 1930s. The coins were purportedly found in a family safe deposit box in 2003 by Joan Langbord, the daughter of Israel Switt, a dealer who acquired the coins almost 70 years earlier. In asserting a superior right to the coins, the government charged that Switt participated in the theft of the coins, and violated governmental decrees, including the Gold Reserve Act of 1934, that were enacted to counter the 1933 banking crisis by barring the distribution of gold. To prove that Switt obtained and then kept the coins knowing that the possession was unlawful, the government introduced evidence that on a separate occasion Switt was compelled to forfeit 98 different gold coins that he possessed in contravention of the Gold Reserve Act of 1934. The Court of Appeals affirmed the admission of this evidence under Rule 404(b), stating, "the fact that Switt had previously forfeited gold coins to the Government is relevant to his knowledge that holding gold coins may be unlawful under certain circumstances." *Id.* at 193-94.

Likewise here, evidence that Williams previously ran afoul of the precise campaign finance and financial disclosure laws at issue in this case is highly probative of his knowledge of those laws, and is therefore admissible under Rule 404(b). This permissible inference does not rely on propensity. The proof here will establish that Williams was questioned regarding violating laws concerning PAC expenditures for personal purposes, and regarding financial disclosure rules, and testified to his understanding of the laws and commitment to abide by them, all before he engaged in the

wrongful personal expenditures charged in this case. It further will establish that Aubrey Montgomery, whom Williams hired specifically to advise on such matters, advised him that certain expenditures he made were impermissible, and advised the implementation of better controls with respect to the PAC's spending practices. This is a textbook application of 404(b) evidence to prove knowledge of wrongdoing, without any reliance on the proposition that because he did something before he must have done it again.

There are a large number of other Third Circuit decisions approving the use of 404(b) evidence of prior bad acts in order to establish knowledge with respect to the charged wrongdoing. (These decisions also confirm that the evidence of prior prosecutions of bribe-takers and investigations of city employees regarding vehicle use are relevant to prove knowledge, though the character issue is not presented.) *See, e.g., United States v. Repak,* 852 F.3d 230, 245 (3d Cir. 2017) (proof that the executive director of a municipal redevelopment authority (JRA) accepted uncharged gratuities from contractors seeking public work was admissible to prove his knowledge that the charged gratuities were not "unilateral token gifts" but rather "knowingly and intentionally accepted . . . with an understanding that those items were to influence the award of JRA contracts to those contractors"); *United States v. Willis*, 844 F.3d 155, 169-70 (3d Cir. 2016) (a legislative official was charged with receiving money from contractors to facilitate the award of renovation contracts to those contractors, and asserted in defense that he did not know the payments were bribes as opposed to loans; evidence that when he held a different government position he received money from one of the contractors in exchange for lifting a lien on that person's bank account was

admissible to show "that he knew that these payments were not loans, that they were not gifts, and that he intended to accept cash in exchange for handing out more government contract work"); *United States v. Bailey*, 840 F.3d 99, 127-28 (3d Cir. 2016) (in prosecution for weapon possession, evidence of prior firearm conviction was admissible to prove the defendant's knowledge that drug dealing in the area where he participated in drug trafficking was a violent enterprise in which drug dealers were frequently armed); *United States v. Kolodesh*, 787 F.3d 224, 236 (3d Cir. 2015) (no plain error in admission of evidence of uncharged fraudulent conduct: where the defense asserted that the defendant operated a legitimate home health care business, "the relevance of the government's evidence is clear: Kolodesh knew what fraudulent practices looked like— indeed, he taught them to Pugman and Ganetsky—and if Kolodesh was as intimately involved in Home Care Hospice as Pugman testified, he certainly would have known of the fraudulent conduct"); *United States v. Kellogg*, 510 F.3d 188, 201 (3d Cir. 2007) (in a prosecution for fraudulently billing for environmental test services that were not performed, allowing the admission of 404(b) evidence of other false representations made to a state agency in order to prove the defendant's knowledge in making false statements); *United States v. Saada*, 212 F.3d 210, 223-24 (3d Cir. 2000) (evidence of prior fraud admissible to prove knowledge of charged fraudulent scheme); *United States v. Jemal*, 26 F.3d 1267, 1276 (3d Cir. 1994) (evidence that defendant participated in prior scheme to defraud creditors is "highly relevant" to show knowledge and intent and admissible under Rule 404(b) in prosecution for similar scheme); *United States v. Console*, 13 F.3d 641, 658-59 (3d Cir. 1993) (evidence that lawyers who conspired with a

doctor to submit fraudulent medical bills to insurances companies also engaged in a

similar scheme with other doctors "tended to support the finding that [the lawyers] knew

[the] bills [related to the charged claims] were fraudulent and that they intentionally

submitted them to insurance companies as part of a broader plan to defraud insurance

companies through fraudulent personal injury claims.").

The evidence regarding the 2008-2009 matter is therefore admissible to prove

Williams' knowledge that is relevant to the present charges.

### E.    The Evidence is Not Unduly Prejudicial.

None of the evidence offered here – regarding the previous prosecutions of bribe-

takers, investigations of city employees' vehicle use, and compliance with PAC rules – is

unduly prejudicial.

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative

value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence." This rule

> "creates a presumption of admissibility." *United States v. Claxton*, 766 F.3d 280,
> 302 (3d Cir. 2014). "Evidence cannot be excluded under Rule 403 merely because
> its unfairly prejudicial effect is greater than its probative value. Rather, evidence
> can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its
> probative value." *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002)
> (alteration in original) (quoting Fed. R. Evid. 403).

*United States v. Repak*, 852 F.3d 230, 246 (3d Cir. 2017). Moreover, "prejudice" does not

mean simply that the evidence is harmful to the defendant's case.

> Rule 403 does not offer protection against evidence that is merely prejudicial, in
> the sense of being detrimental to a party's case. Rather, the rule only protects

against evidence that is *unfairly* prejudicial. Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, F.R.Evid. 403.

*Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (emphasis in original). "[T]he prejudice against which [Rule 403] guards is *unfair* prejudice – prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found.'" *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (*quoting Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (emphasis in original)). "Virtually all evidence is prejudicial or it is not material." *Carter*, 617 F.2d at 972 n.14 (*quoting Dollar v. Long Manufacturing Co.*, 561 F.2d 613, 618 (5th Cir. 1977)).

The relevant evidence proffered here is not unduly prejudicial. Proof that Williams previously prosecuted and investigated the same conduct with which he is accused, or was challenged regarding his compliance with campaign finance rules, does not invite an emotional reaction. Rather, to the extent any prejudicial impact exists (beyond the strength the evidence adds to the government's case), it may readily be ameliorated with a proper jury instruction.[6] The Third Circuit has often concluded that an appropriate jury

---

[6] The Third Circuit has allowed the admission under Rule 404(b) even of information that appeared far more prejudicial than anything involved in the current case. For example, in *United States v. Green*, 617 F.3d 233 (3d Cir. 2010), the defendant was charged with attempted possession of a kilogram of cocaine with intent to distribute. The Court held that a district court did not abuse its discretion in admitting evidence regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case, because the evidence helped explain the conversations between the defendant and a cooperator, and to explain the cooperator's motives in assisting law enforcement. The Court added: "We note that we have rejected Rule 403 challenges to

instruction eliminates the chance of unfair prejudice, and that juries are presumed to follow such instructions. *See, e.g.*, *United States v. Lee*, 612 F.3d 170, 191 (3d Cir. 2010); *United States v. Givan*, 320 F.3d 452, 462 (3d Cir. 2003). Here, the government will propose use of Third Circuit Model Jury Instructions-Criminal § 4.29, regarding 404(b) evidence, which was approved by the Third Circuit in. *Lee*, 612 F.3d at 191-92 & 191 n.25.[7]

## IV.  CONCLUSION.

In sum, evidence of Williams' knowledge of the rules applicable to the PAC fraud and vehicle fraud allegations, and of his awareness of the illegality of accepting benefits in exchange for official action, is highly relevant to elements the government must prove in this case. At the same time, none of the evidence is unduly prejudicial, or runs afoul of the prohibition of introducing evidence solely to prove propensity based on character. For all of these reasons, the government respectfully requests permission to offer at trial the evidence of other acts described in this memorandum.

---

the admission of evidence that was just as prejudicial as the evidence at issue here. *See, e.g.*, [*United States v. Scarfo*, 850 F.2d 1015, 1020 (3d Cir. 1988)] (evidence of uncharged murders); *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir.1996) (evidence of uncharged rape)." *Green*, 617 F.3d at 252. *See also Bronshtein v. Horn*, 404 F.3d 700, 730-31 (3d Cir. 2005) (under a state rule akin to Fed. R. Evid. 404(b), the trial court permissibly allowed evidence of participation in another murder to prove the identity of the killer in the charged murder).

[7]  In *United States v. Davis*, 726 F.3d 434, 445 (3d Cir. 2013), the Court suggested that the limiting instruction should be given at the time the evidence is admitted, not just in the final jury charge.

Respectfully submitted,

JEFFERSON B. SESSIONS III
Attorney General of the United States

WILLIAM E. FITZPATRICK
Acting United States Attorney
for the District of New Jersey


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
VINEET GAURI
ERIC W. MORAN
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified

below through the Electronic Case Filing (ECF) system:


> Thomas F. Burke, Esq.
> Borum Burke & DiDonato LLC
> Two Penn Center Plaza
> 1500 John F. Kennedy Blvd., Ste. 900
> Philadelphia, PA  19102


> */s Vineet Gauri*
> VINEET GAURI
> Assistant United States Attorney


Dated:  May 19, 2017.