# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 17-137** |
| **RUFUS SETH WILLIAMS** | **:** | |

## GOVERNMENT'S OMNIBUS RESPONSE TO
## DEFENDANT RUFUS SETH WILLIAMS'S PRETRIAL MOTIONS

# TABLE OF CONTENTS

I.    The Defendant's Motion to Dismiss Counts One to Fifteen Must be
      Denied Because the Superseding Indictment Sufficiently Pleads the
      Crimes Charged ......................................................................................... 4

      A.    Counts One To Fifteen of the Superseding Indictment Properly
            Allege Travel Act, Hobbs Act, and Honest Services Fraud
            Violations ........................................................................................ 4

      B.    The *McDonnell* Decision............................................................... 12

      C.    *McDonnell* Does Not Apply to the Travel Act Counts in the
            Superseding Indictment................................................................. 15

      D.    Each of Counts One to Fifteen Meet the *McDonnell* Standard.................. 22

II.   The Randolph Fraud May Be Proven Without Luther Anthony
      Randolph's Testimony, and Moreover Sylvia Randolph May
      Testify Regarding Her Husband's Stated Intention ............................................. 31

III.  Pennsylvania Campaign Finance Law Supports the PAC Fraud
      Allegations in Counts Twenty-Two To Twenty-Five; Evidence of
      Such Violations of State Law is Admissible ............................................................ 38

IV.   The Motions in Limine Should Be Denied .......................................................... 51

      A.    The Testimony of Lynne Abraham is Relevant and Admissible ................ 51

      B.    The Testimony of Monique Wescott is Relevant and Admissible.............. 57

      C.    The Testimony of Aubrey Montgomery is Relevant and
            Admissible....................................................................................... 58

      D.    Testimony Related to the PAC Fraud is Appropriate .................................. 59

      E.    The Statements of Financial Interest and Other Reports to the
            Philadelphia Board of Ethics Are Admissible to Prove
            Concealment.................................................................................... 60

      F.    The Sequestration of Case Agents is Rejected By Law ............................... 64

The government responds to the following pretrial motions filed by defendant Rufus Seth Williams:

1.    Defendant Williams' Motion to Dismiss Counts One through Fifteen of the Indictment.

2.    Defendant Williams' Motion to Exclude Hearsay Evidence.

3.    Defendant Rufus Seth Williams' Motion to Dismiss Counts 22, 23, 24 and 25.

4.    Motions in Limine.

These motions are without merit and should be denied.

1. Counts One to Fifteen of the Superseding Indictment allege violations of the Travel Act and other federal laws based on Williams's receipt of extensive benefits in exchange for official acts. The premise of Williams's motion to dismiss these counts is that his alleged conduct on behalf of the payors did not consist of "official acts" as defined in *McDonnell v. United States,* 136 S. Ct. 2355 (2016).

Williams's arguments fails for a number of reasons. First, these counts are sufficiently pled. Second, *McDonnell* does not even apply to all of the counts at issue, most notably the Travel Act charges contained in Counts One to Five and Seven to Twelve that are premised on state bribery law, not on the Hobbs Act or honest services bribery charges at issue in *McDonnell*. Third, Williams only argues the absence of an "official act" with regard to one alleged action – Williams's efforts to thwart secondary screening of Mohammad Ali at the airport. He presents little to no argument regarding the other acts charged. Nevertheless, Williams's efforts on behalf of Ali, as well as all of

- 1 -

his other charged conduct, in fact comprised "official acts" as defined in *McDonnell*. The motion to dismiss therefore fails with respect to all of the counts at issue.

2. Counts Nineteen to Twenty-One rest on an allegation that Williams defrauded the nursing home at which his mother resided, as well as friends of his mother – Luther Anthony Randolph and Sylvia Randolph – who acted to contribute $10,000 toward her medical expenses. Apparently seeking to take advantage of Mr. Randolph's possible unavailability to testify at trial due to medical reasons, Williams argues that Sylvia Randolph may not testify regarding Mr. Randolph's intention concerning the $10,000 payment and, without such testimony, the fraud charges may not be sustained. This effort fails, as the government may prove the fraud even if Mr. Randolph is unavailable based on Sylvia Randolph's testimony and other evidence. Moreover, Mrs. Randolph may testify regarding her husband's intention based on a well-grounded and explicitly applicable hearsay exception.

3. Williams moves to dismiss Counts Twenty-Two to Twenty-Five of the indictment, which allege his fraud on his political action committee through his use of its funds for personal purposes, by asserting that, under state law, he was essentially allowed to use PAC funds for anything he liked. A review of state law readily defeats that notion. The law allows only expenditures for the purpose of influencing an election, and in presenting the charges, the government carefully and conservatively alleged as fraudulent only personal expenses that do not remotely satisfy that test.

4. In his Motions in Limine, Williams seeks to exclude all testimony regarding the PAC fraud, based on the same invalid argument offered in his motion to dismiss Counts Twenty-Two to Twenty-Five. Williams also moves to exclude:

-- the testimony of former District Attorney Lynne Abraham, who is an important witness concerning Williams's misappropriation of City vehicles, as charged in Counts Twenty-Six to Twenty-Nine;

-- the testimony of Aubrey Montgomery, whose testimony is relevant for the reasons explained in the government's pending motion to admit evidence under Rule 404(b);

-- the testimony of Monique Wescott, who may offer brief and relevant testimony about Williams's personal use of official vehicles; and

-- evidence of Statements of Financial Interest and reports filed with the Philadelphia Board of Ethics, which are relevant to prove Williams's receipt and concealment of bribe payments.

All of Williams's requests to exclude this material evidence are meritless. Finally, Williams oddly and without explanation moves to sequester the case agents from the courtroom, notwithstanding binding authority that refutes this request. All of his motions should be denied.[1]

---

[1] An overview of all of the charges is presented in the government's pending motion to admit 404(b) evidence. Additional facts are presented as warranted in the arguments below.

**I.      The Defendant's Motion to Dismiss Counts One to Fifteen Must be Denied Because the Superseding Indictment Sufficiently Pleads the Crimes Charged.**

Counts One to Fifteen of the Superseding Indictment each plead the elements of the crimes that they charge, and apprise Williams, in detail over 46 pages, of the nature of the charges against him. Unable to assail the Superseding Indictment's detailed allegations, the defendant instead cites a jury instruction case, *McDonnell*, in an effort to get behind them and challenge the government's proofs. In his sole challenge to the Superseding Indictment's corruption charges, Williams argues that the government will not be able to prove that the acts he performed and agreed to perform in exchange for bribes amount to "official acts" under 18 U.S.C. § 201(a) as interpreted in the *McDonnell* decision. This argument fails for numerous reasons.

With respect to charges under the Travel Act (Counts One to Five and Seven to Twelve) (the "Travel Act counts"), Williams is wrong on the law. Pennsylvania's bribery law, not Section 201(a), informs the prohibited acts addressed in the Travel Act counts, and the acts that Williams performed and agreed to perform on behalf of payors are squarely within the unlawful activity described by that law. Further, all of the acts alleged meet the "official acts" definition under *McDonnell*, and therefore Counts Six and Thirteen to Fifteen are valid as well. Williams's motion to dismiss Counts One to Fifteen must fail.

**A.      Counts One To Fifteen of the Superseding Indictment Properly Allege Travel Act, Hobbs Act, and Honest Services Fraud Violations.**

Under Rule 7(c)(1) of the Federal Rules of Criminal Procedure, an "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting

the offense charged . . . [and cite to] the statute . . . that the defendant is alleged to have violated." An indictment is "sufficient so long as it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Kemp,* 500 F.3d 257, 280 (3d Cir. 2007) (internal quotation marks omitted).

If the indictment contains additional factual averment, it "fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). A ruling on a motion to dismiss is not, however, "a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000) (citations omitted). To the contrary, "the district court [must] accept[ ] as true the factual allegations set forth in the indictment." *United States v. Bergrin*, 650 F.3d 257, 264-65 (3d Cir. 2011) (alterations in original; citations omitted); *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Ultimately, "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). Therefore, a Rule 12(b)(3)(B) challenge to the sufficiency of the indictment "should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).

Over the course of 46 of its 63 pages, the Superseding Indictment details each of the elements of the Travel Act, Hobbs Act, and honest services wire fraud charges in Counts One to Fifteen, and fully apprises the defendant of the nature of those alleged violations. The motion to dismiss is entirely without merit.

1. A Travel Act violation occurs when an individual "travels in interstate . . . commerce or uses the mail or any facility in interstate . . . commerce, with intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity . . . ." 18 U.S.C. § 1952(a)(3).[2] The Travel Act includes as an "unlawful activity" the offense of "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States . . . ." 18 U.S.C. § 1952(b); *see United States v. Bencivengo*, 749 F.3d 205, 213-14 (3d Cir. 2014). Thus, the essential elements of a Travel Act violation in this case are: (1) the defendant traveled or caused travel in interstate commerce, or used or caused the use of a facility in interstate commerce; (2) the defendant did so with the intent to promote, manage, establish, or carry on, or facilitate the promotion, management, establishment, or carrying on of the unlawful activity described in the indictment; (3) the unlawful activity described in the indictment was bribery, contrary to the laws of the Commonwealth of Pennsylvania; and (4) after traveling or using a facility as described above, the defendant knowingly and deliberately, did, or attempted to do, an act, in order to promote, manage,

---

[2] All of Counts One to Fifteen also charge aiding and abetting, under 18 U.S.C. § 2.

establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the unlawful activity. *See* 2A K. O'Malley, J. Grenig, and W. Lee, Fed. Jury Prac. & Instr. (Criminal) § 54:03.

Counts One to Five and Seven to Twelve of the Superseding Indictment sufficiently aver the elements of Travel Act violations. Specifically, this indictment states that Williams knowingly and intentionally "did travel and cause, procure, and induce travel in interstate and foreign commerce and use and cause, procure, and induce the use of facilities in interstate and foreign commerce, as set forth below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity – namely, bribery contrary to 18 Pa. C. S. § 4701 – and, thereafter, performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity." Superseding Ind. at 7, ¶ 9; 21-22, ¶ 9. It describes the violations of Pennsylvania state bribery law in detail by laying out the specific benefits that Williams solicited, accepted, and agreed to accept from the Business Owners, Superseding Ind. at 4-5, ¶ 5 (including more than $9,000, expenses for an all-inclusive Punta Cana vacation for Williams and his girlfriend, a custom sofa, luxury goods, and clothing, and expensive dinners from Business Owner #1); 19, ¶ 5 (including airline tickets for six trips for Williams, his family members, and his girlfriend; a Jaguar XK8 and the value of premiums paid to insure that vehicle; and cash from Business Owner #2). It describes the actions that Williams took or agreed to take as the District Attorney on behalf of the Business Owners. Superseding Ind. at 5-6, ¶ 6 (pressuring and

- 7 -

advising Police Official #1, and agreeing to write a letter to do the same to a United States Homeland Security official, to limit security screenings at the United States border for Business Owner #1; and assisting Business Owner #1 in connection with a case and matter under supervision by the District Attorney's Office ("DAO"); 20, ¶ 6 (appointing Business Owner #2 as Special Advisor to the DAO, including issuing an official credential and badge holder; issuing a letter to a California agency to influence a then-pending administrative matter in Business Owner #2's favor; and obtaining an official police report for Business Owner #2). It further alleges that Williams performed, or agreed to perform, acts for each Business Owner "as consideration and in exchange for" the pecuniary benefits that he received from the Business Owners, respectively. Superseding Ind. at 4, ¶ 4; 6, ¶ 6 (regarding Business Owner #1) & 18-19, ¶ 4; 20, ¶ 6 (regarding Business Owner #2). With respect to both Travel Act schemes, the Superseding Indictment lays out each instance of travel or use of interstate facility, Superseding Ind., Counts One to Five and Seven to Twelve (Column 2), and then each subsequent act performed, or attempted, to promote, manage, establish, carry on, or to facilitate such ends, for the unlawful activity – bribery in violation of Pennsylvania law, Superseding Ind., Counts One to Five and Seven to Twelve (Column 3). These allegations meet the elements of pleading promoting and facilitating bribery in violation of the Travel Act.

　　　2. The Superseding Indictment properly alleges Hobbs Act extortion under color of official right. A Hobbs Act offense has two elements:  (1) the defendant knowingly or willfully committed or attempted to commit extortion, and (2) the defendant's conduct

affected interstate commerce. *See United States v. Powell*, 693 F.3d 398 (3d Cir. 2012).

"Extortion" includes "obtaining of property from another, with his consent, . . . under

color of official right." 18 U.S.C. §§ 1951(a), (b)(2). It is the "rough equivalent of what

we would now describe as 'taking a bribe,'" *Evans v. United States*, 504 U.S. 255, 260

(1992), and requires a showing that the public official "induced, obtained, accepted, or

agreed to accept a payment to which he or she was not entitled, knowing that the payment

was made in return for taking, withholding, or influencing official acts." Third Circuit

Criminal Model Jury Instructions § 6.18.1951-6. In short, "[a] public official commits

extortion under color of official right under 18 U.S.C. § 1951(a) when the official

promises to engage in an official act in exchange for a personal gift." *United States v.

Delle Donna*, 366 F. App'x 441, 450 (3d Cir. 2010) (not precedential) (citing *Evans,* 504

U.S. at 268).

     Counts Six and Thirteen of the Superseding Indictment sufficiently aver the

elements of Hobbs Act extortion under color of official right. Count Six plainly alleges

that Williams knowingly and willfully did "obstruct, delay, and affect interstate and

foreign commerce, and attempt so to do, by extortion under color of official right – that

is, by agreeing to obtain and obtaining money and other things of value from Business

Owner #1, with consent, in exchange for [his] exercise of, and agreement to exercise,

official authority and influence as specific opportunities arose."  Superseding Ind. at 15,

¶ 3. Notably, there need not be one benefit for one official act; instead, it is a Hobbs Act

violation for an official to accept a "stream of benefits" in exchange for one or more

official acts. *See Kemp*, 500 F.3d at 282. That is what the Superseding Indictment alleges.

Count Thirteen avers similar facts with respect to Business Owner #2. Superseding Ind. at 42, ¶ 3. In exchange for such money and other things of value these counts then recount the official acts that Williams performed and agreed to perform on behalf of the respective Business Owner. Superseding Ind. at 14, ¶ 3a. & b.; 42-43, ¶ 3a., b., & c. And it amply alleges the jurisdictional predicate of affecting interstate commerce for both schemes. Superseding Ind. at 14, ¶ 2.a. & b. (regarding Business Owner #1) & 40, ¶ 2.a. (regarding Business Owner #2). These allegations properly plead Hobbs Act extortion in Counts Six and Thirteen.

      3. Finally, the Superseding Indictment properly alleges honest services wire fraud. An honest services wire fraud offense has three elements: (1) that the defendant knowingly devised a scheme to defraud the victim of its intangible right of honest services by materially false or fraudulent pretenses, representations, or promises; (2) the defendant acted with the intent to defraud; and (3) in advancing, furthering, or carrying out the scheme, the defendant transmitted, or caused the transmission of, any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce. *See* Third Circuit Criminal Model Jury Instructions § 6.18.1343. Honest services wire fraud requires "a *quid pro quo,* that is, a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013) (quoting *United States v. Wright,* 665 F.3d 560, 567-68 (3d Cir. 2012)). These allegations are at the core of the Superseding Indictment.

      Counts Fourteen and Fifteen meet the pleading standard for alleging honest services wire fraud. Those counts allege that the DAO, the City and the County of

Philadelphia, and the citizens thereof, had an intangible right to the honest services of their City employees and elected public officials and, conversely, that Williams owed the City, the County, and the citizens thereof a duty, among other things, to "refrain from receiving bribes and kickbacks in exchange for [his] official action and influence, and for violating his duties as District Attorney." Superseding Ind. at 44, ¶ 2. Despite these duties, the Superseding Indictment alleges that Williams schemed to deprive the DAO, the City and the County of Philadelphia, and the citizens thereof of his honest services by engaging in a bribery and kickback scheme, as follows:

> by accepting and agreeing to accept a stream of concealed bribes and kickbacks (a) from Business Owner #1 in exchange for defendant WILLIAMS's official action and influence, and for violating his official duties, in matters relating to (i) a criminal case and matter under investigation by the DAO related to Person #1; and (ii) security screening of Business Owner #1 by law enforcement authorities at the United States border when Business Owner #1 was attempting to return to the United States after foreign travel; and (b) from Business Owner #2 in exchange for defendant WILLIAMS's official action and influence, and for violating his official duties, in matters relating to (i) the appointment of Business Owner #2 as Special Advisor to the DAO; (ii) the CDABC's determination of whether or not Business Owner #2 could continue as an officer and stockholder of a business entity that held a California liquor license; and (iii) an official police accident report related to a car accident involving Person #3.

Superseding Ind. at 45 ¶ 5. Finally, the Superseding Indictment alleges that Williams transmitted, or caused to be transmitted, interstate wires for the purpose of executing and attempting to execute his scheme; namely, Statements of Financial Interest that misleadingly omit reference to substantial benefits that he received from Business Owners #1 and #2. Superseding Ind. at 46 (Counts Fourteen and Fifteen). These counts, too, are properly pled.

### B.     The *McDonnell* Decision.

Notwithstanding the fact that Counts One to Fifteen of the Superseding Indictment are plainly sufficient – they contain the elements of each offense charged, apprise the defendant of what he must be prepared to meet, and allow the defendant to plead former jeopardy, *Kemp,* 500 F.3d at 280 – Williams claims that the charges should be dismissed based on *McDonnell v. United States,* 136 S. Ct. 2355 (2016). He is incorrect.

In *McDonnell*, the former Governor of Virginia, Robert McDonnell, and his wife were convicted at trial of honest services fraud based on bribery and Hobbs Act extortion for their roles in accepting bribes, while in office, from Virginia businessman Jonnie Williams. 136 S. Ct. at 2362. Williams ran Star Scientific, whose main product was a nutritional supplement, Anatabloc, derived from tobacco. *Id.* at 2361-62. To market Anatabloc as an anti-inflammatory, Williams needed FDA approval, which required research studies demonstrating Anatabloc's safety and effectiveness. *Id.* Believing these studies would be most persuasive if conducted by Virginia's state medical schools, Williams enlisted the help of then-Governor McDonnell, who did not directly control the medical schools' funding decisions, but appointed the schools' Boards of Directors. *Id.* While soliciting the Governor's help, Williams gave the McDonnells over $175,000 in gifts and loans. *Id.* at 2364.

The government argued at trial that McDonnell committed the following "official acts" to assist Williams in exchange for those bribes: (1) arranging meetings for Williams with state officials who were subordinate to the Governor to discuss Anatabloc; (2) hosting a product launch for Anatabloc at the Governor's mansion attended by state

researchers; (3) contacting other government officials as part of the effort to encourage Virginia research universities to study Anatabloc; (4) promoting Star Scientific's products by allowing Williams to invite individuals important to his business to exclusive events at the Governor's mansion; and (5) recommending that senior government officials meet with Star Scientific to discuss how their products could lower healthcare costs. *Id*. at 2365-66. "The government also argued more broadly that these activities constituted 'official action' because they related to Virginia business development, a priority of Governor McDonnell's administration." *Id*. at 2361.

The parties agreed to use the definition of "official act" found in the federal bribery statute, 18 U.S.C. § 201(a)(3), in the jury instructions, and the district court instructed the jury that an "official act" is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id*. at 2365. The district court further instructed that "official act" encompasses "acts that a public official customarily performs," including acts "'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" *Id*. at 2366 (citation omitted). The district court, however, refused to give McDonnell's requested instruction that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone,

'official acts'. . . because they are not decisions on matters pending before the government." *Id.* (internal quotation marks and citation omitted).

The Supreme Court reversed and remanded, finding that the jury was incorrectly instructed on the meaning of "official act" and may have convicted McDonnell for conduct that was not unlawful. *Id.* at 2375. In reaching that conclusion, the Supreme Court interpreted "official act" in Section 201(a)(3) as follows:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more – does not fit that definition of "official act."

*Id.* at 2371-72.

 Simply put, *McDonnell* enumerated "two requirements." *Id.* at 2368. First, the government "must identify a 'question, matter, cause, suit, proceeding or controversy'" that may be pending or may be brought before a public official. *Id.* Second, the government must prove "that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so," or recommended that another official do so. *Id.* Such a decision or action may include acting on a "qualifying step," such as, in the *McDonnell* case, narrowing the list of potential research projects. *Id.* at 2370.

The Supreme Court clarified that "setting up a meeting, hosting an event, or making a phone call" was not "always an innocent act." *Id*. at 2371. While lacking direct control over the outcome of a particular question or matter, the bribed public official certainly can take "action on" the matter "by using his official position to exert pressure on another official," or by "advising" another official to take action, "knowing or intending that such advice would form the basis for an 'official act' by another official." *Id*. at 2369-70. In this regard, the Court stated,

> If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id*. at 2371. The Court further explained that "[i]t is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged quid pro quo." *Id*.[3]

### C.    *McDonnell* Does Not Apply to the Travel Act Counts in the Superseding Indictment.

Notably, *McDonnell* did not involve crimes charged under 18 U.S.C. § 1952 ("the Travel Act") and the Pennsylvania bribery statute. Counts One to Five and Seven to

---

[3]  The Supreme Court also reaffirmed that (1) the crime is the agreement to take official action in exchange for the bribe, (2) the agreement need not be explicit, and (3) the public official "need not specify the means that he will use to perform his end of the bargain." *Id*. at 2370-71.

Twelve of the Superseding Indictment allege violations of 18 U.S.C. § 1952(a)(3) relating to bribes Williams solicited, accepted, and agreed to accept from Mohammad Ali ("Business Owner #1") and Michael Weiss ("Business Owner #2"), respectively.[4] Williams has made no attempt to specify why the Travel Act counts would be infirm under the specific dictates of the Travel Act and its Pennsylvania bribery predicate. He has cited to no authority that *McDonnell* applies to the application or construction of the Pennsylvania bribery statute. He merely assumes that *McDonnell* would apply. His assumption is incorrect.

As set forth earlier, a Travel Act charge requires proof of travel or use of a facility in interstate or foreign commerce with intent to further any unlawful activity, including bribery in violation of state law. Notably, "[t]he Travel Act incorporates into federal law a given state's substantive law of bribery. . . crimes at issue in a particular prosecution, even if those laws contain more expansive definitions of said crimes than those found at common law." *United States v. Manzo*, 851 F. Supp. 2d 797, 804 (D.N.J. 2012); *see also United States v. Dansker*, 537 F.2d 40, 47 (3d Cir. 1976) ("This broad interpretation of the Act has enabled it to encompass state statutory expansions of the crimes of extortion, bribery and arson over the years, and thus more effectively carry out its purpose of aiding local law enforcement efforts to combat 'pernicious undertakings which cross state

---

[4]  With one brief exception, noted below, Williams' arguments are almost exclusively focused on the Superseding Indictment's bribery allegations relating to Ali. He makes no serious effort to allege that the bribery scheme with Weiss did not involve "official acts."

lines.'"). Because the Travel Act references bribery as a predicate activity, it is clear that

Congress intended for the Travel Act to supplement state authority in battling such

crimes. *Perrin v. United States,* 444 U.S. 37, 44 (1979). The Superseding Indictment

alleges that Williams's travel and use of facilities in interstate commerce was done with

intent to further violations of 18 Pa. C.S. § 4701(a), the Pennsylvania bribery statute.

Superseding Ind. at 7, ¶ 9 & 21, ¶ 9. Thus, with respect to the Travel Act counts, it is

Section 4701, not 18 U.S.C. § 201(a) and the Court's interpretation in *McDonnell*, that

defines the prohibited acts.

In Pennsylvania, Section 4701(a) was based almost verbatim on the Model Penal

Code ("MPC") provision pertaining to official bribery. It provides, in relevant part, that a

person is guilty of bribery "if he offers, confers or agrees to confer upon another, or

solicits, accepts or agrees to accept from another: (1) any pecuniary benefit as

consideration for the decision, opinion, recommendation, vote or other exercise of

discretion as a public servant . . . by the recipient; (2) any benefit as a consideration for

the decision, vote, recommendation or other exercise of official discretion by the

recipient in a judicial, administrative or legislative proceeding; or (3) any benefit as

consideration for a violation of a known legal duty as public servant . . . ."[5] This Section

"extends bribery to cover all public employes [sic]," includes a "broad" definition of the

benefit constituting a bribe that "is intended to reach every possible type of offer made or

---

[5] Williams has not challenged the Superseding Indictment's allegations that he
violated his legal duties.

designed to influence official action," and is "intended to prohibit selling . . . special influence." 18 Pa. C.S. § 4701, cmt.; *Commonwealth v. Moran*, 104 A.3d 1136, 1146-47 (Pa. 2014) (quoting official comment to Section 4701).[6]

Unlike 18 U.S.C. § 201(a)(3) (the "official act" provision under scrutiny in *McDonnell*), the Pennsylvania bribery statute quoted above does not employ the same term. Instead, Section 4701 refers to an array of official conduct: "decision, opinion, recommendation, vote or other exercise of discretion as a public servant."

Section 4701 also is not limited to those acts strictly within a public official's authority. Indeed, Section 4701 specifically provides

> **Defenses prohibited.**--It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, had left office, or lacked jurisdiction, or for any other reason.

18 Pa. C.S. § 4701(b). Section 4701(b) excludes as a defense an argument that the subject to whom the bribe was offered could not perform the actions desired by the person

---

[6] Section 4303 of the 1939 Penal Code, which preceded Section 4701, prohibited giving and promising to give things of value to a public official in order to "obtain or influence" an act that was "[d]epending or which shall depend before him [o]r them." The Pennsylvania Supreme Court construed "[d]epending or which shall depend before him [o]r them" to mean giving a bribe to a public official for the purpose of influencing a matter that is "[w]ithin the scope of his official duties." *Commonwealth v. Bellis*, 399 A.2d 397, 399 (Pa. 1979). In 1973, the Pennsylvania legislature repealed Section 4303 and enacted Section 4701, which contains no language limiting prohibited acts to those within the public official's "official duties." The absence of such limiting language in Section 4701 indicates that the Pennsylvania legislature intended that the proscribed conduct need not be within the scope of the public official's "official duties," although Section 4701(a)(2) does prohibit the exercise of "official discretion" in a judicial, legislative, or administrative proceeding in exchange for a benefit.

offering the bribe because, for example, he "lacked jurisdiction" or "for any other reason." *United States v. Mazzio*, 501 F. Supp. 340, 343 (E.D. Pa. 1980), *aff'd*, 681 F.2d 810 (3d Cir. 1982). *See also Bencivengo*, 749 F.3d at 214 (holding in the context of a Travel Act prosecution that an analogous provision of New Jersey bribery law, which also is based on the Model Penal Code, "makes clear that the lack of actual jurisdiction over the decision is no defense to the crime").

In construing the provisions of its MPC-based bribery statute, the Pennsylvania Supreme Court has looked to the MPC's comments for guidance. *See Moran*, 104 A.3d at 1145. Those comments suggest that the array of official conduct specified in the Pennsylvania bribery statute is different and broader than *McDonnell's* definition of "official acts," providing:

> The official action that is the subject of [the first subsection of the MPC bribery offense] focuses upon decision-making, i.e., upon the exercise of discretion by the designated persons. *It is designed to include minor ministerial acts as well as major decisions of policy.* It follows prevailing law in making it immaterial whether the decision for which the bribe was offered would have been made in the same manner without the bribe or whether the result of the decision is viewed as correct or incorrect. Situations where no exercise of discretion is involved are covered in Paragraph (3) dealing with the violation of a "duty."

> Current bribery statutes sometimes speak of bribing an official with intent to influence his decision, vote or other action in a matter which is or may be pending before him. Standing alone, such a formulation would appear to restrict bribery to decision-making or discretionary functions of public servants who may have matters "pending" before them, and thereby exclude from coverage ministerial activities and bribery of prospective public servants. *To make sure that these latter activities are insulated from corruption, most recent revisions of bribery statutes follow the Model Code by making no distinction between the kinds of "official action" that may be affected by a bribe. Thus, for example, Indiana's bribery statute prohibits any payment "with intent to control the performance of an act related to the employment or function of the public servant." This formulation provides essentially the same coverage as the Model Code.*

MPC Annotated, Comment 6, art. 240.1, at 34 (footnotes omitted) (emphasis added). The comment's observation regarding then-current more restrictive bribery statutes is close to the position set forth in *McDonnell*, requiring a decision or action (or a qualifying step) with regard to a specific matter or hearing. But the MPC commentary goes on to explain that the MPC bribery statute is broader, reaching all public servants' conduct relating to their employment or function as public servants (and even prospective public servants as well).

Hence, the Model Code commentators, having reviewed and accounted for bribery statutes in existence at the time (including 18 U.S.C. § 201), determined that a broader base of official conduct should be subject to the official bribery proscription set forth in the MPC.[7] The Pennsylvania legislature passed the MPC bribery statute almost verbatim.[8] The comments to the MPC therefore should be persuasive, and Section 4701

---

[7] Indeed, Section 4701 is broader than its federal counterparts in other ways, as well. For instance, unlike the federal official bribery statutes (18 U.S.C. §§ 201 and 666), the Pennsylvania statute does not employ the term "corruptly," so as to bar the inappropriate defenses that the bribe payor was only countering opposing offers, or that the payor was influencing the public servant into making the right decision. *See Moran*, 104 A.3d at 1145. Additionally, a public servant may violate this provision by acting recklessly. *Id.* at 1149-50 (citing 18 Pa. C.S. 302(c)).

[8] The MPC bribery statute adds the word "recipient's" before the word "decision" in both subsections (1) and (2) of the model. Section 4701 added the phrase "by the recipient" to the MPC provision in both Section 4701's subsections (1) and (2). These alterations are immaterial to the meaning of the statute in general and irrelevant to the subject at issue here.

should be construed on that basis, and should not be subject to the interpretation of the definition of "official acts" under 18 U.S.C. § 201(a)(3) as set forth in *McDonnell*.

The *McDonnell* Court's concern regarding federalism supports this outcome. There, the Supreme Court observed that "[a] State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' . . . That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." 136 S. Ct. 2355, 2373 (2016) (citation omitted). Here, Pennsylvania has regulated the permissible scope of interactions between public officials and others by adopting the MPC provision on bribery. Accordingly, the Court should not apply *McDonnell*'s definition of "official act" to Section 4701.[9]

As explained at length earlier, the allegations in Counts One to Five and Seven to Twelve properly allege the essential elements of the Travel Act, and Williams offers no

---

[9] This conclusion also draws support from the fact that federal appellate courts have been hesitant to apply Supreme Court-imposed narrowing principles applicable to federal corruption statutes when construing state bribery statutes in cases where state legislatures or courts have not themselves limited such construction. For instance, in *United States v. Frega*, 179 F.3d 793, 805 (9th Cir. 1999), in the wake of the Supreme Court's holding in *United States v. Sun Diamond*, 526 U.S. 398, 414 (1999), construing the gratuity statute applicable to federal officials to require a link between the thing of value given to a public official and a specific official act, the Ninth Circuit rejected the defendant's argument seeking such linkage under California's bribery statute. Likewise, in *United States v. Jackson*, 72 F.3d 1370, 1376 (9th Cir. 1993), after the Supreme Court held in *McCormick v. United States*, 500 U.S. 257 (1991), that, for a Hobbs Act violation in a case where the public official accepted a campaign contribution, there must be an explicit trade of a contribution for official action, another Ninth Circuit panel declined to read such an explicit quid pro quo requirement into California's bribery statute.

argument to the contrary. Further, the counts describe acts that unquestionably fall within the broad state prohibition of a "decision, opinion, recommendation, vote or other exercise of discretion as a public servant" made in exchange for a benefit – including attempting to influence others to limit security screening by law enforcement authorities at the United States border; offering to assist a person in connection with a criminal case and matter under investigation by the DAO; hiring a person as a special advisor; and attempting to influence a state agency with respect to a pending administrative matter. The Travel Act charges are fully sufficient and not undermined at all by *McDonnell.*

### D. Each of Counts One to Fifteen Meet the *McDonnell* Standard.

Regardless, the allegations in the Travel Act counts still meet the requirements of *McDonnell*. The same is true for the allegations charging Hobbs Act extortion (Counts Six and Thirteen) and honest services fraud (Counts Fourteen and Fifteen), which incorporate the factual allegations of the Travel Act counts.

Williams claims that "secondary screening of passengers entering the United States via foreign travel" is not a "question, matter, cause, suit, proceeding or controversy" under *McDonnell* because there is no formal exercise of governmental power on a matter that is "pending" or "may by law be brought" before a public official. Motion to Dismiss Counts One to Fifteen of the Indictment (referred to hereafter in this part as "Motion") at 6. That is plainly wrong. As a traveler entering the United States at Philadelphia International Airport, Ali was subject to inspection and search by public officials of the U.S. Department of Homeland Security. Each time Ali returned to the country in this fashion, his reentry was a matter pending before a DHS official, who

- 22 -

could formally exercise governmental power to question or search Ali during the screening process. *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border . . . in order to regulate the collection of duties and to prevent the introduction of contraband into this country."); *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) ("Customs officials characteristically inspect luggage and their power to do so is not questioned"); *Carroll v. United States*, 267 U.S. 132, 154 (1925) ("Travelers may be [stopped and searched] in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belonging as effects which may be lawfully brought in.").[10] Thus, if a person paid money at the border to influence the action of an official with regard to admission or customs, that would unquestionably violate the federal bribery statute.

In *United States v. Repak*, 852 F.3d 230 (3d Cir. 2017), a public official was convicted under the Hobbs Act for accepting bribes to use his authority to influence the award of contracts by a redevelopment agency (JRA). The defendant argued that such an action was not akin to the suit or controversy described in *McDonnell*. The Third Circuit disagreed, stating, "The awarding of a JRA contract is not only akin to an agency determination—it is an agency determination." *Id.* at 253. Likewise here, the screening of

---

[10]   While beyond the scope of the Court's inquiry in this motion to dismiss, the evidence will further demonstrate that federal officials at the airport are aided in their security efforts by assigned Philadelphia police officers.

a traveler entering the country is an agency determination, which Williams endeavored to influence, in exchange for benefits. The Ali counts are clearly sufficient under *McDonnell.*

Williams contends that he did not take official action by "merely setting up a meeting" with Ali and Police Official #1. Motion at 6, 9, 15-17. Further, Williams argues that he "did not order or demand" that Ali "be excused from secondary screenings," so his inquiries as to Ali did not rise to an "official act." *Id.* at 6, 9. However, the Superseding Indictment alleges that Williams – "the chief law enforcement officer for the City and County of Philadelphia" – did "exert pressure on and advise" Police Official #1 to assist Ali in limiting these screenings. Superseding Ind. at 2, 5-6. The indictment alleges a much more specific effort to assist Ali on a particular matter than the introductory meetings at issue in *McDonnell.* Moreover, the defendant in a bribery scheme need not have control over the outcome of the question or matter – the matter may be pending before "any public official." *McDonnell*, 136 S. Ct. at 2369. *McDonnell* recognized that if an official takes "action on" a matter "by using his official position to exert pressure on another official" or by advising another official to take action, "knowing or intending that such advice will form the basis for an 'official act' by another official," then "that would be a crime." *Id*. at 2370 (reaffirming *United States v. Birdsall*, 233 U.S. 223, 234 (1914) (officials operating as probation officers were convicted for taking bribes to recommend leniency to the Commissioner of Indian Affairs, who had the power to reduce or suspend sentences)); *see also United States v. Fattah*, - F. Supp. 3d -, 2016 WL 7839022, at \*20 (E.D. Pa. Oct. 20, 2016) (Fattah "was without question

- 24 -

exerting pressure on and if not pressure certainly seeking to providing advice to the President and Senator Casey with the intent that they would act on that advice. Fattah was not merely expressing support for Vederman's appointment and then letting the matter rest.") (internal citation omitted); *see also Bencivengo*, 749 F.3d at 212-13 (holding that, "where a public official has, and agrees to wield, influence over a governmental decision in exchange for financial gain, or where the official's position could permit such influence, and the victim of an extortion scheme reasonably *believes* that the public official wields such influence, that is sufficient to sustain a conviction under the Hobbs Act, regardless of whether the official holds any *de jure* or *de facto* power over the decision.") (italics in original).

Williams also inappropriately attempts to dissect Public Official #1's grand jury testimony to support his claim that the government failed to satisfy *McDonnell*'s standard for "official acts." Motion at 6-9. But a pretrial motion to dismiss "is not a permissible vehicle for addressing the sufficiency of the Government's evidence," but rather "should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside it." *Bergrin*, 650 F.3d at 264 (internal quotations and citations omitted). "Evidentiary questions – such as credibility determinations and the weighing of proof – should not be determined at this stage." *Id.* (internal quotations and citations omitted); *see also DeLaurentis,* 230 F.3d 661 (there is no criminal equivalent to a civil pretrial summary judgment).

Williams additionally argues that his "mere offer" to write a letter on behalf of Ali to the U.S. Department of Homeland Security does not constitute an "official act."

Motion at 10, 16. However, the Superseding Indictment alleges that, "as consideration
and in exchange for [valuable] benefits," Williams "*agreed* to use his official position to
assist" Ali, including Williams's "repeated offers" to draft and send an official letter to
"influence the conduct of law enforcement officials conducting screenings" of Ali upon
Ali's return flights from abroad.[11] Superseding Ind. at 5-6, 13-14 (emphasis added).
These offers by Williams "serve as evidence of an *agreement* to take an official act," that
is, his agreement to exert pressure and advise the U.S. Department of Homeland Security
to limit security screenings of Ali. *McDonnell*, 136 S. Ct. at 2371 (emphasis added).

---

[11]  As alleged in Count Five, Williams stated to Ali in a February 2014 text
message, "Give me the information of the Homeland Security folks that were running the
investigation so I can send a letter." Motion at 13-14. In subsequent text messages,
Williams stated:

(a)     "No, I want to send a letter to whomever the people in [the public
official's] office spoke with at Homeland Security."

(b)     "I need the info . . . case number, agent anything so I can write a letter to
the correct person of supervisory authority."

(c)     "I want there to be a letter in your file from the D.A. of Philadelphia."

(d)     "So get me whatever info you think I need. Thanks."

(e)     "[Business Owner #1]…I still want the info so I can send the letter."

(f)     "That plus the exact agency and agent that conducted the original
investigation."

*Id*. at 14. These statements are textbook examples of offers to engage in official
acts as described in *McDonnell*, to advise another public official to take official
action. Indeed, his requests to obtain details from Ali are "qualifying steps" to his
drafting an official letter on Ali's behalf, and themselves would qualify as official
acts under *McDonnell*, 136 S. Ct. at 2370.

Next, Williams briefly argues that an agreement to "look into" a pending criminal case for Person #1 "is a routine constituent service exempted from the Federal Bribery Statute." Motion at 10. However, the Superseding Indictment alleges that Williams did more than just agree to "look into" the case. Rather, it alleges that Williams agreed to use his official position to obtain a more favorable plea for Ali's associate, Person #1, in a criminal case pending before the DAO. Superseding Ind. at 5-6; *see id*. at 7-8 ("Between on or about February 1, 2012, and February 5, 2012, while in Punta Cana, defendant WILLIAMS was asked by [Ali] for official assistance in connection with a criminal case and matter under investigation by the DAO against Person #1, and defendant WILLIAMS agreed to provide such official assistance."). The Superseding Indictment further states that the case at issue had proceeded too far for Williams to intervene, but Williams stated, "It seems like he has the possibility of having it thrown out or continued . . . if it gets continued I will then ask for the file and see what can be done to make it a county sentence. . . . In the future always give me at least a week to help a friend." *Id.* at 12. This statement followed Williams's expression of concern about taking action at a stage that would look "extremely suspicious." *Id.* at 11. The fact that Williams did not intercede in the DAO's prosecution of Person #1 in this instance is not a defense, *McDonnell*, 136 S. Ct. at 2371 (bribe recipient need not follow through on the promise or perform any official act; he must agree to do so, but he need not intend to honor his agreement), particularly where, as here, Williams left the door open to use his official authority in the future to help Ali, stating: "In the future always give me at least a week to help a friend . . . ." Superseding Ind. at 12.

According to Williams, "[m]erely agreeing to do what your job requires you to do is not 'official action.'" *Id.* at 10 n.2. Williams is off by a country mile. The very point of bribery laws is to assure that routine official actions occur based on honest assessment, not corrupt motive. *See United States v. Brewster*, 408 U.S. 501, 526 (1972) ("acceptance of the bribe is the violation of the statute, not performance of the illegal promise."); *United States v. Bryant*, 655 F.3d 232, 242 (3d Cir. 2011) (appellants' argument that the public official would have taken many of the same official actions even if he had not accepted bribes is inapposite; conviction for honest services fraud may be sustained "so long as there is sufficient evidence in the record for the jury to conclude that the public official intended to be influenced in exchange for a stream of corrupt payments."); *United States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) (approving instruction: "It is not a defense that the official act sought to be influenced would have been done anyway regardless of the fact that the bribe was received or accepted. That is to say, even if the defendant acted as he or she normally would if the bribe had not been requested, the crime of bribery has still been committed."); *United States v. Mosberg*, 866 F. Supp. 2d 275, 295 (D.N.J. 2011) ("[E]ven if the official actions he ultimately takes in favor of the payor are unchanged, the [public official's] decision-making process is still influenced"); *United States v. Bryant*, 556 F. Supp. 2d 378, 393 (D.N.J. 2008) (an "exchange" of official actions for a bribe necessarily means that the bribe had some influence on a public official's discretion, even if the official's actions were the same as they would have been absent the bribe, "because the 'exchange' removes discretion from the official – which he is obligated to exercise in the best interests of the public – and instead locks

him into a position favoring one constituent, as dictated by the quid pro quo

arrangement"). Indeed, the government need not allege that Williams's bargained-for

official action or influence was a misuse of his office. *See United States v. Evans*, 30 F.3d

1015, 1019 (8th Cir. 1994) (the Hobbs Act "does not suggest that the government must

prove anything more than that the official conduct was undertaken in return for a benefit"

and rejecting the defense's contention that "the government must prove that the official

conduct was also wrongful"). As the commentary to the Third Circuit Criminal Model

Jury Instructions states:

> It is not necessary for the government to prove that the defendant actually misused
> or attempted to misuse the power of his/her office insofar as the defendant granted
> some benefit or favor to the payors. Though the payors may not have gotten any
> more than their due in the defendant's performance of his office, the defendant's
> acceptance of money or a benefit, in return for the use of, or the attempted use of,
> his/her office is extortion.

Third Circuit Criminal Model Jury Instructions § 6.18.1951-6, Comment, at 556 (West

2009) (citing, among other cases, *United States v. Antico*, 275 F.3d 245, 255-58 (3d Cir.

2001)).

To recap, the Superseding Indictment alleges that Williams promised to take

actions on behalf of Ali – to advise and pressure officials connected to airport security to

ease screening of Ali, and to consider altering the prosecution of a person by Williams's

office – that, a jury may find, are "official acts" as defined in *McDonnell.*

As for the second charged bribery scheme, involving Weiss, Williams makes no

effort at all to suggest that the Superseding Indictment fails to allege official acts, other

than stating in conclusory fashion that the indictment is insufficient. Motion at 10-11, 15-

16. The charges are plainly sufficient. The indictment alleges that, in exchange for many benefits, Williams appointed Weiss as a special advisor to the District Attorney's Office and obtained a badge for him, and assigned him specific duties. Such an appointment is unquestionably an "official act." *See, e.g.*, *Fattah*, -- F. Supp. 3d --, 2016 WL 7839022 at *19 ("The appointment of an ambassador is a specific and focused exercise of governmental power," as was the hiring of the girlfriend of the defendant public official's benefactor to a position in the official's office); *see also United States v. Farley*, 2 F.3d 645, 651 (6th Cir. 1993) (sale of honorary deputy sheriff commissions and credentials constituted official acts for the purpose of Hobbs Act under color of official right). Second, Williams issued a letter in his capacity as the District Attorney to the California Department of Alcoholic Beverage Control ("CDABC") to recommend favorable action for Weiss on the specific question whether or not Weiss could continue as an officer and corporate stockholder of a business entity that held a California liquor license. Superseding Ind. at 20. Such a recommendation to another official in a pending proceeding falls squarely within the *McDonnell* definition, as explained earlier. Third, the Superseding Indictment alleges that Williams agreed to use his official position to assist Weiss by obtaining an official police accident report for Weiss. *See United States v. Jones,* 207 F. Supp. 3d 576, 579 (E.D.N.C. 2016) (FBI agent's action in using authority to direct a phone company to produce text messages is an "official act" under *McDonnell*). A jury may find that all of these acts are "official acts," and Williams presents no argument otherwise.

In the end, the questions at issue are for the jury. "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged quid pro quo. The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question." *McDonnell*, 136 S. Ct. at 2371. *See United States v. Williams*, 2017 WL 1030804, at *4 (N.D. Ga. 2017) (in denying Rule 12 motion to dismiss charges based on *McDonnell*, district court observed that *McDonnell* was not a case assessing the sufficiency of the indictment and the full import of *McDonnell* would be addressed at trial). The jury in this case, unlike that in *McDonnell*, will be properly instructed regarding all counts. The government will then present ample evidence demonstrating acts that fall within the purview of both the Travel Act and the federal bribery provisions. Williams's motion to dismiss Counts One to Fifteen should be denied.

## II.   The Randolph Fraud May Be Proven Without Luther Anthony Randolph's Testimony, and Moreover Sylvia Randolph May Testify Regarding Her Husband's Stated Intention.

In his Motion to Exclude Hearsay Evidence (hereafter in this part, "Motion"), Williams seeks to exclude the testimony of Sylvia Randolph, and to dismiss Counts Nineteen to Twenty-One of the superseding indictment, on the theory that Randolph may not testify regarding her husband's statements, and that without such testimony the charges may not be sustained. He is incorrect on all points.

The indictment alleges that Williams engaged in a scheme to defraud a nursing home and the Randolphs, by diverting to his personal use money that he was

contractually obligated to pay to the nursing home for his mother's care. These funds included his mother's Social Security and pension income, as well as a $10,000 check provided by the Randolphs, friends of Williams's mother, to assist with her medical expenses. Williams spent all of this money on himself.

The Randolph check for $10,000 was written on a joint account of Luther Anthony Randolph and Sylvia Randolph, dated October 21, 2013, payable to Seth Williams, signed by Mr. Randolph, without any information on the memo line. Williams deposited the check in his personal account, and spent all of the funds for his own needs.

Relying on grand jury testimony, Williams asserts that Sylvia "Randolph has no personal knowledge of why the check was written," Motion at 2, and that she "testified that she didn't know whether or not the check was for Williams's mother's care. Rather, it was her husband that would have knowledge of the purpose of the check," *id.* He further states that Sylvia may not testify regarding any statement of her husband: "Sylvia Randolph's testimony regarding the purpose of the check is hearsay. Anything told to Randolph by her husband regarding the purpose of the check is being offered for the truth. It is an out of court statement and is not subject to any of the enumerated hearsay exceptions under FRE 803." Motion at 3. On these grounds, Williams moves to preclude Sylvia Randolph's testimony and dismiss Counts Nineteen to Twenty-One.

Williams's motion is without merit. First, his dismissal motion impermissibly invites the Court to peer beyond the Superseding Indictment to examine the evidence, in violation of Third Circuit precedent. *See Bergrin*, 650 F.3d at 265 ("A ruling on a motion to dismiss is not . . . a permissible vehicle for addressing the sufficiency of the

government's evidence") (internal citations and quotation marks omitted). Second, he misstates Sylvia's testimony completely. In fact, she testified that she was aware of the purpose of the check – to help with Williams's mother's medical expenses – and she approved of the expenditure on that basis. The charges may be sustained based on that testimony alone, along with other evidence showing that the Randolphs intended to give the money to Williams's mother, and Williams simply stole it. That evidence includes that the Randolphs had no relationship at the time with Seth Williams as opposed to his mother, and no reason whatsoever to give Seth Williams $10,000; that Williams's own amended financial disclosure statement states that the $10,000 was "for mother's medical expenses and other personal expenses"; that Sylvia observed her husband hand the check to Williams's mother, not Seth Williams; and that Williams then spent the money entirely on his mortgage, alimony, school tuition, and myriad other of his own personal obligations, without devoting as much as a nickel to his mother's needs.[12]

---

[12]   In presenting Sylvia Randolph's detailed testimony at trial, the government of course is not limited by the grand jury exchange. But it bears mentioning that Williams' selective review of the grand jury testimony is quite misleading. In fact, she testified before the grand jury:

> Q.   Do you know why your husband wrote this check to Seth Williams?
>
> A.   For one thing, he had the money to be this generous for one thing. Why he wrote it to Seth was because I guess he assumed Seth could get the check from his mother and take it to the bank and things like that. The idea was that it was to be used for Imelda, the mother's purposes.
>
> Q.   I want to be careful. When I ask questions I don't want you to guess. Based on your understanding and your familiarity with that check with this

Second, his suppression motion is legally unfounded. Sylvia Randolph will testify that her husband discussed the check with her, as would be expected for such a large expenditure, and expressed to her his intention to write the check to help with the nursing home expenses of Williams's mother. She also heard him express this intention to Seth Williams on the telephone, when Mr. Randolph called Williams to tell him that he would be giving the check to Williams's mother. That testimony, while hearsay, is unquestionably admissible under the Rule 803(3) exception for statements of present intent and motive. The rule allows admission of Sylvia Randolph's account of her husband's statements regarding his intent and motive in writing the check.

Rule 803 provides:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . .

 (3) Then-Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

"It is too well settled to require discussion that a declaration of a state of mind or intention is admissible to prove that the declarant actually had such intention." *Blackburn*

---

household transaction did you have an understanding of why the money was given to the Williams family; how it was to be used?

A.    I don't think either of us – it was given to the mother to help with the mother's medical expenses.

Tr. 11.

*v. Aetna Freight Lines, Inc*., 368 F.2d 345, 348 (3d Cir. 1966) (in a wrongful death action, permitting proof of the decedent's statement to his wife and son of intent to reenter a particular business, to show possible future earnings). Further, "[s]tatements admitted under Fed. R. Evid. 803(3) to show the declarant's intent or plan may be used to show that the declarant acted in accord with that plan." *United States v. Donley*, 878 F.2d 735, 738 (3d Cir. 1989).

The rule is traced to *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892). In that seminal case, a widow sued to collect on life insurance policies of her husband, who she alleged was found dead at Crooked Creek in Kansas. The defendants asserted that the body was that of a different person. In *Hillmon*, the Supreme Court held that letters in which the widow's husband stated his plan to travel to Crooked Creek in the days ahead could be introduced to prove his intent, and the court could then infer from that intent that the decedent carried out his plan and in fact traveled to Crooked Creek, making it more likely that the body discovered there was in fact his. The Supreme Court reasoned that "[t]he existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be." *Id*. at 295.

With regard to Mr. Randolph's intent and motive in writing the check to Seth Williams, the decision in *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000), is particularly on point. There, a state legislator was charged with perjury for denying to a grand jury that he was reimbursed for a contribution he made to a presidential campaign.

The government alleged that the defendant's nephew, Michael Serafini, engaged in a scheme to violate federal election law by collecting numerous $1,000 contributions to the candidate from relatives and associates (including the defendant), and then reimbursing those payors. To prove the scheme, the government presented the testimony of numerous other check writers, who testified that Michael promised to reimburse them for contributions, and did so. *See* 2000 WL 34430756, at *6-7 (government's brief describes the evidence). The Third Circuit held that Michael's statements regarding the purpose of his reimbursement checks were admissible under Rule 803(3), stating:

> We conclude that the conversations in which Michael was involved were admissible under the hearsay exception provided by Federal Rule of Evidence 803(3), as evidence of Michael's state of mind at the time of the conversations. Michael's state of mind during these conduit transactions was relevant to show that he intended his check to Serafini to be a reimbursement (as he did with the other conduits); this evidence tends to support an inference that it was Michael's general practice to reimburse contributors for their contributions, and thus that the check to Serafini was in fact a reimbursement.

*Serafini*, 233 F.3d at 769-70.

Under this precedent, Sylvia Randolph's testimony regarding her husband's stated intent in writing the check is plainly admissible.[13] *See also Citizens Fin. Grp., Inc. v.*

---

[13]  The Third Circuit, while repeatedly endorsing the admission of 803(3) evidence for the purpose presented here, has made clear that, while an out-of-court statement is admissible to prove present intent, plan, and motive, it is not admissible to indirectly prove the truth of the underlying facts which prompted that state of mind. Thus, for instance, *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc*., 63 F.3d 1267, 1274 (3d Cir. 1995), held that customers' statements that they could receive lower prices elsewhere may be admitted under Rule 803(3) to prove their motive in taking business elsewhere, but not to prove the fact – the prices were in fact lower – that justified the motive. *See also United States v. Hernandez,* 176 F.3d 719, 726-27 (3d Cir. 1999). This limitation is

*Citizens Nat. Bank of Evans City*, 383 F.3d 110, 133 (3d Cir. 2004) (in trademark infringement dispute, customers' statements regarding their confusion were admissible under the state-of-mind exception); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252-53 & 252 n.11 (3d Cir. 1999) (in antitrust action, statements of customers that they no longer shopped at stores due to lower prices elsewhere were admissible under state-of-mind exception to show their motive; the fact that the customers were unidentified is irrelevant); *United States v. Donley*, 878 F.2d 735, 738 (3d Cir. 1989) (statement of deceased wife that she planned to move out of the marital home were admissible under Rule 803(3) and supported the government's theory that this provided the motive for her husband to then kill her); *United States v. Sebetich*, 776 F.2d 412, 428 (3d Cir. 1985) (defense should have been permitted to introduce evidence that another person stated an intention to commit the bank robberies in question).

Likewise, in *United States v. Vignola*, 464 F. Supp. 1091 (E.D. Pa.), *aff'd mem.*, 605 F.2d 1199 (3d Cir. 1979), a prosecution of a judge for accepting bribes from writ servers, the court allowed out-of-court statements of a writ server that he had to pay the defendant to further the scheme. Judge Lord wrote: "Such 'state of mind' testimony is relevant in cases of bribery, since it proves which of the many possible reasons (e.g., gift, loan repayment) explains a particular giving and acceptance of money." *Id.* at 1101.

---

irrelevant here, where the only issue is Mr. Randolph's intent in writing a check. The evidence is not offered to prove anything about Williams's mother's condition that prompted that intent, which will be amply proven by independent evidence.

In sum, Sylvia Randolph may testify regarding both her own intent and her husband's stated intent and motive. There will be ample proof of Williams's scheme to defalcate their $10,000 check, and the motion to preclude her testimony and dismiss Counts Nineteen to Twenty-One should be denied.

### III.   Pennsylvania Campaign Finance Law Supports the PAC Fraud Allegations in Counts Twenty-Two To Twenty-Five; Evidence of Such Violations of State Law is Admissible.

Williams moves to dismiss Counts Twenty-Two to Twenty-Five of the Superseding Indictment, and in a separate motion in limine to suppress virtually any evidence offered in support of such claims as irrelevant. Because Counts Twenty-Two to Twenty-Five of the Superseding Indictment properly plead wire fraud, and evidence that the defendant seeks to suppress is relevant to these and other charges, these motions must be denied.

Counts Twenty-Two to Twenty-Five of the Superseding Indictment allege that Williams knowingly siphoned off or misspent political action committee ("PAC") funds, and concealed his fraud through inaccurate and misleading Campaign Finance Reports ("CFRs"). The defendant makes no argument that the Superseding Indictment fails to plead wire fraud sufficiently; instead, his sole basis for dismissal of these counts is that "all of Williams's expenditures cited by the government in their superseding indictment were permissible expenditures as a matter of Pennsylvania election law." Motion to Dismiss Counts 22, 23, 24 and 25 (hereafter in this part, "Motion") at 6. However, in making this argument, Williams concedes just what the Superseding Indictment alleges:

- 38 -

that, at a minimum, Pennsylvania law limits PAC spending to costs incurred "for the purpose of influencing the outcome of an election." Motion at 4-5; Superseding Ind. at 52, ¶ 2.f(1). The government agrees with that proposition, and the Superseding Indictment charges that the expenditures at issue here did not qualify. The defendant is free to argue to the jury that the allegedly improper expenses (such as "deep pore facials," birthday massages for Williams, and women's leggings) were proper campaign expenditures. The Superseding Indictment alleges that they were not, and that the PAC's CFRs, which either omitted or inaccurately described these expenses, constituted an act of concealment. Because the Superseding Indictment properly pleads the elements of wire fraud with respect to Counts Twenty-Two to Twenty-Five, and its factual averments must be accepted as true, the defendant's motion fails.

To sufficiently charge wire fraud, an indictment must allege the following three essential elements: "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012); *see also United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010); *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (discussing the elements of mail fraud under 18 U.S.C. § 1341);[14] Third Circuit Criminal

---

[14]  Cases construing the elements of mail fraud apply equally to wire fraud cases. *See Al Hedaithy*, 392 F.3d at 590 (establishing the elements necessary to "prove mail or wire fraud"); *United States v. Giovengo*, 637 F.2d 941, 944 (3d Cir. 1980).

Model Jury Instructions § 6.18.1343. A scheme to defraud "need not include false representations to violate the scheme or artifice clause of section 1341." *United States v. Frankel,* 721 F.2d 917, 921 (3d Cir. 1983). And "fraudulent representations, as the term is used in [section] 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments." *United States v. Olatunji,* 872 F.2d 1161, 1167 (3d Cir. 1989) (internal citations and quotation marks omitted). Indeed, a failure to disclose in the face of a known duty itself may constitute a misrepresentation for the purpose of the mail and wire fraud counts. *See*, *e.g.*, Third Circuit Criminal Model Jury Instructions § 6.18.1341-1 ("deceitful statements of half truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements").

The Superseding Indictment plainly alleges that Williams knowingly and intentionally schemed to defraud the PAC of money by means of materially false and fraudulent pretenses, representations, and promises by misapplying PAC funds to personal expenses. Superseding Ind. at 53, ¶ 3. It accurately summarizes restrictions on PAC spending set forth in Section 3241(d). Superseding Ind. at 51-52, ¶ 2.e.-f. It further alleges that defendant Williams used an intermediary to siphon money out of his PAC for his own personal benefit. Superseding Ind. at 53, ¶ 4.a. It alleges that he caused the PAC to incur numerous expenses for his own personal benefit, which had nothing to do with the outcome of an election. Superseding Ind. at 53-54, ¶ 4.b., and c. Those expenses included massages, facials, clothing, and birthday and holiday parties for Williams's

- 40 -

girlfriend. Superseding Ind. at 53-54, ¶ 4.b. (birthday and holiday parties), and c. (massages, facials, and clothing). Williams then concealed payment of those improper expenses through CFRs that either omitted or inaccurately described the prohibited expenses. Superseding Ind. at 54-55, ¶ 4.e. Finally, the Superseding Indictment alleges that, to execute his scheme, defendant Williams knowingly and intentionally caused wires to be transmitted in interstate commerce (a) to complete the payment transactions for the prohibited payments (Counts Twenty-Three and Twenty-Five), and (b) to conceal the scheme by publishing the inaccurate and incomplete CFRs (Counts Twenty-Two and Twenty-Four). Superseding Ind. at 55-56, ¶ 5. These allegations meet the standard of charging the defendant with defrauding the PAC.

Numerous cases have recognized the viability of mail and wire fraud charges in the context of misapplication of campaign funds. *See*, *e.g.*, *United States v. Henningsen*, 387 F.3d 585, 590 (7th Cir. 2004) (finding sufficient evidence to uphold a mail fraud conviction against a candidate for election who diverted campaign funds to his private use); *United States v. Blandford*, 33 F.3d 685, 692 (6th Cir. 1994) (affirming RICO violation predicated on mail fraud involving diversion of campaign funds for personal use in violation of Kentucky law, and subsequent mailings of campaign finance reports that inaccurately described such diversions); *United States v. Curry*, 681 F.2d 406, 409 (5th Cir. 1982) (finding sufficient evidence to uphold mail fraud conviction against chairman of political action committee who converted political contributions for personal use and gave false reports on financial disclosures required under state law); *United States v. Fullwood*, 2016 WL 5106940, at *1, *6 (M.D. Fla. 2016) (denying defendant's motion to

dismiss wire fraud charges based on allegations that defendant used campaign funds for personal expenses and "avoided detection by submitting false campaign expenditure reports to the State of Florida which included inflated and/or non-existent campaign expenses"); *United States v. Reed*, 2015 WL 5944333, at *6 (E.D. La. 2015) (denying motion of the defendant, the District Attorney for Louisiana's 22nd Judicial District, to dismiss wire fraud charge based on his improper personal use of campaign funds because "contributors did not expect their contributions to be used for personal expenses as such personal expenditures are in violation of Louisiana's campaign finance laws"), *reconsideration denied,* 2016 WL 54903, at *10-11 (E.D. La. 2016); *Walker v. United States*, 2012 WL 902797, at *6 (S.D. Ga. Mar. 5, 2012) (denying *habeas corpus* relief to defendant convicted of wire fraud based on misuse of campaign funds for personal reasons, including for gambling debts, giving money to a friend's romantic interest, and purchasing family gifts); *United States v. Delle Donna*, 552 F. Supp. 2d 475, 494 (D.N.J. 2008) (denying motion to dismiss indictment for fraud when mayor's campaign contributions were expended for personal purposes and concealed through false campaign finance reports). Consistent with this precedent, the Superseding Indictment properly alleges wire fraud.

The only case that the defendant cites is *United States v. Pisani*, 773 F.2d 397 (2d Cir. 1985), which reversed the mail fraud conviction of a state senator who used campaign funds to pay personal expenses because "[n]o provision of New York law in effect prior to th[e] indictment prohibited a candidate from using campaign funds for personal purposes." *Id.* at 407. But unlike New York's pre-1985 campaign finance laws,

Pennsylvania law *does* limit PAC spending. Specifically, Section 3254.1 of Pennsylvania's Election Code, entitled "Lawful Election Expenses," limits permissible PAC expenses only to those categories listed in "section 1621(d)." *See* 25 Pa. Stat. § 3254.1 ("No candidate, chairman or treasurer of any political committee shall make or agree to make any expenditure or incur any liability, except as provided in section 1621(d)."). Section 1621(d), which is codified as Section 3241(d) of the Election Code, defines the term "expenditure" to include four discrete categories of permissible campaign expenses, such as payments to other PACs, payment of vendors who assist a campaign, and payment of campaign workers.[15] *See* 25 Pa. Stat. § 3241(d)(2)-(4). Section 3241(d)(1) includes expenses paid "for the purpose of influencing the outcome of an election." *See* 25 Pa. Stat. § 3241(d)(1); *Scott v. Wilkinson*, 863 A.2d 62, 66 (Pa. Cmwlth.

---

[15]  Section 3241(d) states as follows:

The word **"expenditure"** shall mean:
(1) the payment, distribution, loan or advancement of money or any valuable thing by a candidate, political committee or other person for the purpose of influencing the outcome of an election;
(2) the payment, distribution, loan, advance or transfer of money or other valuable thing between or among political committees;
(3) the providing of a service or other valuable thing for the purpose of influencing the outcome of a nomination or election of any person to any public office to be voted for in this Commonwealth; or
(4) the payment or providing of money or other valuable thing by any person other than a candidate or political committee, to compensate any person for services rendered to a candidate or political committee.

25 Pa. Stat. § 3241(d).

2004) ("Section 1621(d)(1) permits the *expenditure of money* by such Party committee *for the purpose of influencing the outcome of an election.* Pursuant to Sections 1626 . . . of the Election Code, it becomes the responsibility of the Party committee to report, properly, the funds it has received and the expenditures it has made.") (internal quotation marks and citations omitted) (italics in opinion). Thus, under Pennsylvania law, use of PAC funds for a purpose other than "the purpose of influencing the outcome of an election" is improper. The Superseding Indictment accurately alleges this restriction[16] and the defendant concedes as much in his motion papers. Motion at 4-5 (acknowledging that Section 3241(d) embodies the "limitation" that PAC expenditures must be "for the purpose of influencing the outcome of an election"). Pennsylvania's restriction on PAC spending readily distinguishes this case from *Pisani*.[17]

The Sixth Circuit's decision in *Blandford* is instructive. In that case, Blandford, the Speaker of the Kentucky House of Representatives, was charged with bribery, as well as RICO violations predicated on federal mail fraud after he funneled campaign funds

---

[16]  The Superseding Indictment also summarizes 4 Pa. Code § 177.1, the applicable Pennsylvania code section concerning permissible campaign expenses, and points out that neither Section 177.1 nor Section 3241(d)(1) permits the expenditure of PAC funds for personal use. Superseding Ind. at 52, ¶ 4.g.

[17]  Indeed, the New York state legislature amended that state's Election Law in 1985 to prohibit the use of PAC funds for "personal use which is unrelated to a political campaign or the holding of a public office or party position." *Pisani*, 773 F.2d at 410. The Second Circuit stated in dicta that, "[h]ad this new provision been in effect during the period covered by Pisani's indictment, we would not hesitate to affirm his convictions here." *Id.* The clear import of *Pisani*, therefore, is that evidence of a scheme to defraud a PAC based on misuse of PAC funds for personal purposes in violation of state law properly supports a mail fraud conviction for defrauding the PAC.

through an intermediary to pay personal expenses. 33 F.3d at 692. Blandford arranged to

write a $3,500 check to Guy, a campaign worker, who cashed it and returned the money

to Blandford; Blandford in turn gave the money to his girlfriend. *Id.* To allay Guy's

concerns about personal income tax liability for the $3,500, Blandford wrote Guy a

second, $1,018.50 check. *Id.* Blandford had Guy prepare and mail campaign finance

reports that inaccurately described the payments as reimbursements for campaign-related

work. *Id.* Following his conviction at trial, Blandford appealed his RICO conviction,

citing *Pisani* for the proposition that Kentucky law did not prohibit such uses of

campaign funds. *Id.* at 702. Calling Blandford's reading of Kentucky law "untenable,"

the Sixth Circuit held the Kentucky statute, which like Section 3241(d)(1) listed four

discrete categories of permissible campaign expenses, to "constitute the entire universe of

permissible uses." *Id.* In view of Kentucky's law limiting campaign spending, the Sixth

Circuit found the *Pisani* case, which "involved no state statute that in any way limited or

regulated the use or surplus campaign funds," to be "readily distinguishable." *Id.*

*Blandford's* reasoning applies with equal force to this case.

The gravamen of Williams's challenge is the notion that the PAC expenditures

charged in the Superseding Indictment are indeed permitted by Pennsylvania law.[18] He

---

[18] Williams' motion also presents inaccurate statements regarding the indictment.
For instance, he states, "Counts 22-25 also allege that the PAC paid for the defendant's
membership in a social club and also paid for . . . two birthday parties in which donors
also attended." Motion at 1. The indictment does not rest on the payment of membership
fees. It also says nothing about the identity of guests at the parties. The evidence will be
that no donor attended one of the expensive birthday parties for Williams's girlfriend that

makes no such showing, nor could he at this stage. While he states that "[t]he examples of the varied and permissive nature of allowable expenditures in Pennsylvania from campaign funds are legion," Motion at 6, he cites only a few Pennsylvania office-holders' actions in using PAC funds to defend against criminal investigations, one former senator's payment for cell phone bills (which the senator said properly accounted for political activity), and a former mayor's payment of country club dues (also possibly for political purposes). These examples certainly are not "legion," and Williams offers no support at all for the notion that PAC funds may be used freely for anything the candidate wants. To the contrary, Williams acknowledges that expenditures must be "for the purpose of influencing the outcome of an election," and whether the charged expenses here do not qualify will be the issue for the jury. At this point, the allegation of the Superseding Indictment that the expenses do not qualify must be accepted as true.

Williams may well be right that the use of campaign funds by a handful of candidates to defend against charges of impropriety may indeed violate state law. Perhaps such expenditures are justified by an officeholder seeking to be exonerated and to run again for office; or perhaps the expenditures were forbidden. In the articles he cites, a leading scholar in Pennsylvania appears to agree with the latter view, while others sketch a different opinion.[19] But all of this is irrelevant. That type of expenditure is not charged

---

the PAC paid for, while a few donors were among the large group of friends at the other party, and evidence will show that that party had no campaign purpose.

in this case. And the fact that other officials may have violated state law, in a different context, certainly does not provide a defense to Williams for breaking the same law with regard to completely different expenditures.

However broadly Williams attempts to draw the limitation "for the purposes of influencing an election," the Superseding Indictment is narrowly drawn to focus only on those acts – siphoning of cash and paying for clearly personal matters – that cannot

---

[19] G. Terry Madonna, a political scientist at Franklin & Marshall College, was quoted as stating with regard to payments for legal fees in a post-election investigation: "If you look at the definition, in the end, the purpose of it is to influence an election . . . I don't know how you make that work." Paula Reed, "Orie used campaign funds for legal costs," Pittsburgh Post-Gazette (April 17, 2012), http://www.post-gazette.com/local/north/2012/04/17/orie-used-campaign-funds-for-legal-costs/stories.

On the other hand, the theory that legal expenditures to preserve office are permissible finds support in another article, where an election law attorney was quoted as stating, "She could make the argument that these expenditures are necessary to protect her viability as a candidate for office." Charles Thompson, "PA Attorney General Kathleen Kane's 2015 campaign spending shows how she is funding her defense," www.pennlive.com (February 3, 2016), www.pennlive.com/news/2016/02/if_kathleen_kane_is_running_fo.html. The outcome of this debate is irrelevant to this case, which does not involve payment for legal fees.

The third article Williams cites, Rich Cholodofsky, "Broad Pa. laws allow dubious use of campaign cash," Pittsburgh Tribune Review (May 15, 2016), http://triblive.com/news/westmoreland/10341515-74/campaign-office-state, focuses mostly on former office-holders' permissible expenditure of PAC funds to support other candidates, which is certainly "for the purpose of influencing the outcome of an election." The article cites only two more esoteric expenditures (by former officials who mostly used unspent campaign funds to support other campaigns): a former state Senator paid his cell phone bill (but he said he used the phone to make political calls), and a former mayor used $8,000 to pay for country club dues (he did not comment; possibly, such expenditures would be justified if the mayor had future political ambitions or was supporting others). In the article, some observers questioned the legality of these charges. Whatever their legality, they have nothing to do with the much more obviously personal expenditures charged in this case.

conceivably satisfy that limitation. For example, the Superseding Indictment did not charge even such dubious expenses as membership fees for the Social Club and the Sporting Club. Rather, it limited the charges only to the thousands of dollars in specific expenses at these clubs for things like facials and massages and benefits for his girlfriend and family members that are indisputably personal and do not relate to any past, present, or future election campaign.

Throughout his motion, Williams never addresses the actual expenditures – cash, facials, massages, clothing, parties, etc. – which the government alleges violate state law. In this light, his assertion of the "impossibility that the Government will be able to prove the illegality of these expenditures," Motion at 6, rings quite hollow. He merely declares a conclusion: "Under the purposefully broad definition of 'expenditure' in the revised Election Code, all of Williams's expenditures cited by the Government in their superseding indictment were permissible expenditures as a matter of Pennsylvania election law." Motion at 6. The jury certainly may find otherwise. At this point, the allegations of the indictment that these expenditures were not for the purpose of influencing an election are viewed as true, and it will fall to the jury to make the final determination. A motion to dismiss the allegation at this stage is improper, and should be denied.

For the same flawed reasons advanced in his motion to dismiss Counts Twenty-Two to Twenty-Five of the Superseding Indictment, Williams also seeks to suppress all evidence offered to prove those charges. Specifically, he seeks to bar "several witnesses . . . from the Union League, the Sporting Club, Stacey Cummings, Zelli [sic] Colon and

Lisette Gonzalez (from the PAC) as well custodians of records from these institutions to elaborate about certain expenditures paid for by the PAC," and "any other witness whom the government seeks to testify about expenditures from the PAC from testifying." Motion in Limine at 4. Since Counts Twenty-Two to Twenty-Five properly assert a wire fraud scheme, evidence relevant to those charges is admissible. The defendant's motion to suppress that evidence, too, must fail.

Finally, we observe that in his Motion in Limine addressing the subject of the PAC fraud, seeking to preclude all testimony regarding the PAC fraud based on the same argument addressed here, Williams adds the strange argument that the government's presentation of evidence proving the PAC fraud will violate his privilege against self-incrimination. Motion in Limine at 12-13. He states that if the government is allowed to present proof of personal expenditures, the jury "will be forced to [address the issue] without the benefit of testimony from any witnesses with personal knowledge of why these expenditures were made or if they had any relation to influencing the outcome of an election." He continues:

> Regardless of the evidence the Government offers, they will be unable to present Mr. Williams actual knowledge and intent of those expenditures. As already noted above, this is a crucial element in the totality of the circumstances. On such a record, it would be patently unfair to allow the Government to introduce evidence and make representations to the jury regarding the legality or propriety of PAC expenditures. On the other hand, Mr. Williams can take the stand and explain his actions regarding the intention behind the expenditures all the while frustrating his Fifth Amendment right to remain silent. Then, undersigned counsel will be forced to argue the propriety of Campaign Finance expenditures. Under this scenario, the factfinder will have the evidence necessary to resolve the issue but the defendants will have surrendered one of the most fundamental, well-entrenched rights in the American system of justice.

*Id.* This argument is frivolous. The government will present ample evidence showing the

nature of the expenditures and Williams's knowledge of their impropriety (as discussed

in part in the government's Rule 404(b) motion). Needless to say, virtually every trial

involves the presentation of witness testimony and other circumstantial evidence to prove

a defendant's knowledge and intent, without any need for testimony from the defendant

himself. *See* Third Circuit Criminal Model Jury Instructions § 5.01 (regarding proof of

state of mind by circumstantial evidence).

As for Williams, it is entirely up to him regarding whether to testify or present

other witnesses. But if he feels he must testify in light of the strength of the government's

case, that in no way marks a violation of his right against self-incrimination. The

Supreme Court explained:

> The defendant in a criminal trial is frequently forced to testify himself and
> to call other witnesses in an effort to reduce the risk of conviction. When he
> presents his witnesses, he must reveal their identity and submit them to cross-
> examination which in itself may prove incriminating or which may furnish the
> State with leads to incriminating rebuttal evidence. That the defendant faces such a
> dilemma demanding a choice between complete silence and presenting a defense
> has never been thought an invasion of the privilege against compelled self-
> incrimination. The pressures generated by the State's evidence may be severe but
> they do not vitiate the defendant's choice to present an alibi defense and witnesses
> to prove it, even though the attempted defense ends in catastrophe for the
> defendant. However 'testimonial' or 'incriminating' the alibi defense proves to be,
> it cannot be considered 'compelled' within the meaning of the Fifth and
> Fourteenth Amendments.

*Williams v. Florida*, 399 U.S. 78, 83-84 (1970) (rejecting challenge to requirement that

defendant present advance notice of alibi witness). *See also Ohio Adult Parole Auth. v.*

*Woodard,* 523 U.S. 272, 287 (1998) ("there are undoubted pressures – generated by the

strength of the government's case against him – pushing the criminal defendant to testify.

But it has never been suggested that such pressures constitute 'compulsion' for Fifth Amendment purposes."). This rule applies even where the defendant carries a burden of proof and must decide whether to testify to meet it, *United States v. Rylander*, 460 U.S. 752, 758 (1983), or where the government's evidence gives rise to a presumption against the defendant on an evidentiary point which the defendant may rebut by testifying, *Barnes v. United States*, 412 U.S. 837, 846-47 (1973) (concerning a presumption that possession of stolen property permits an inference of knowledge of the status of the property). In *Barnes,* the Supreme Court stated: "Introduction of any evidence, direct or circumstantial, tending to implicate the defendant in the alleged crime increases the pressure on him to testify. The mere massing of evidence against a defendant cannot be regarded as a violation of his privilege against self-incrimination." *Id.* at 847.

For all of these reasons, the motion to dismiss Counts Twenty-Two to Twenty-Five of the Superseding Indictment, as well as the motion in limine to exclude evidence related to these charges, should be denied.

## IV.    The Motions in Limine Should Be Denied.

### A.    The Testimony of Lynne Abraham is Relevant and Admissible.

Williams seeks to exclude the testimony of former District Attorney Lynne Abraham. This motion should be denied, as the testimony at issue is highly significant and probative and not in any respect unduly prejudicial.

The testimony relates to Counts Twenty-Six to Twenty-Nine of the Superseding Indictment, which allege a fraud concerning the use of City and HIDTA vehicles for

Williams's personal benefit. The government will prove that throughout his service as District Attorney, beginning in 2010, Williams used City vehicles assigned to the District Attorney's Office (DAO), and vehicles leased by the DAO with funds from the federal HIDTA program, as his personal vehicles, freeing him of many thousands of dollars in ordinary expenses for acquiring a vehicle and fueling and insuring and maintaining it.

During the workday, Williams was escorted outside the office by two police officers. Two such officers ordinarily worked a shift from 6 a.m. to 2 p.m., while two more worked a shift from 2 p.m. to 10 p.m. (and overtime if needed). At the end of the workday, the drivers dropped Williams at his home, and also left there the official vehicle in which they transported Williams during the day. Officers parked other city vehicles at the home, which the officers would use to return to their homes at the end of the shift. Williams then proceeded during all non-working hours, including during evenings, early mornings, and weekends, to use the official vehicle as he preferred, including for transporting his family, attending to entirely personal matters, and traveling out of town for vacation or for military reserve duty (for which he was separately compensated by the Army). He used gas provided by the City whenever he could (as the officers would fill the tank before leaving the vehicle with him), and spent nothing on insurance or maintenance of the official vehicles he drove.

This conduct flagrantly violated all applicable policies of the City, the DAO, and HIDTA. The DAO policy was the earliest adopted policy that applied to the DAO, and applied throughout the scheme. It was codified on April 29, 2003. It stated that it applied to "all personnel of this office," applying "to sworn and civilian personnel alike." It

provided, in part, that "City vehicles shall not be used for personal or private reasons," and that "City vehicles are not to be used for personal errands other than in the most direct route between work and home." The City and HIDTA policies were always materially identical.

Lynne Abraham was the District Attorney when the 2003 policy was written. It remained in effect until 2016, when an updated policy was issued by a new chief of staff, Kathleen Martin, which left the key provisions of the policy (including the bar on personal use) materially unchanged.

Abraham will testify that the 2003 policy codified the long-established but previously unwritten policy of the DAO, and that it remained in effect when she handed the reins of the DAO to Williams in January 2010. The identical unwritten policy, she will testify, was in effect throughout the time that Williams himself served as an Assistant District Attorney, from 1992 through February 2003 (Abraham was the District Attorney during all of that time). Under the policy, certain supervisors in the DAO were permitted to drive an official vehicle home, but not use it for personal purposes. Indeed, Abraham reports, on one occasion Williams asked her if a vehicle could be assigned to him for take-home purposes. She said no, as his duties did not require it. He then asked her for a raise instead. She said no to that as well. (This sequence of events is probative of his motive in later violating the policy as charged in the indictment – his wrongful conduct was motivated, as was all of the charged conduct in this case, by his perpetual inability to live within his means and his desire to enhance his income.)

Abraham will testify that she maintained a personal copy of the 2003 written policy (which the government will mark as an exhibit), and the policy was also distributed to every Assistant District Attorney. She will testify that the policy applied to her as District Attorney, and she abided by it, as did her predecessors. As District Attorney, she had one police driver assigned to her; he picked her up in the morning at her home, and dropped her off in the evening; during working hours, he drove her to official events. No official vehicle was left at her house. She owned her own vehicle, which she or her husband used for personal matters.

The testimony of the person responsible for promulgating the policy is obviously relevant, and presents no conceivable undue prejudice. Williams avers that "Abraham is the improper witness to call as she was not in office at the time of these alleged offenses and cannot testify as to what, if any policy covered Williams's use of city vehicles during his term in office." Motion at 3-4. But Abraham promulgated the policy, and it remained intact during Williams's tenure; and she further attests that the same policy applied for decades, making it highly likely that it was preserved. Her explanation is therefore probative, and certainly meets the low threshold of relevancy under Federal Rule of Evidence 401.[20]

---

[20] Rule 401 provides for the introduction of "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Third Circuit has held:

Williams offers other objections, but they are fruitless. First, Williams states that Abraham bears "a well-known and well publicized animosity toward the current District Attorney." Motion at 3. However, the government has no intention of asking her about any animosity toward Williams, only about facts relevant to this case. If he believes that she suffers from any improper bias, that is the appropriate function of cross-examination to expose.

Second, Williams states, "any policy implemented by Abraham can be overwritten by subsequent District Attorney's or outright ignored. There is no law, City Code or regulation that requires newly elected officials to adopt the 'policies' of those who came before them." Motion at 3. That is certainly true, and Williams can offer evidence if it

---

The test of relevance under the Federal Rules of Evidence is low. "Because [Rule 401] makes evidence relevant 'if it has any tendency to prove a consequential fact, it follows that evidence is irrelevant only when it has no tendency to prove the fact.'" *Blancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir.1992) (quoting 22 Charles A. Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence § 5166, at 74 n. 47 (1978)).

*Failla v. City of Passaic*, 146 F.3d 149, 159 (3d Cir. 1998).

As McCormick § 152, p. 317, says, "A brick is not a wall," or, as Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 576 (1956), quotes Professor McBaine, "* * * [I]t is not to be supposed that every witness can make a home run."

Advisory Committee Note to Rule 401. As the Supreme Court stated, "it is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue . . . ." *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985). *See also* 2 J. McGlaughlin, Weinstein's Federal Evidence § 401.04[2][c] (2d ed. 2003) (rule "permits evidence to be admitted even if it only slightly affects the trier's assessment of the probability of the matter to be proved.").

exists that he acted to abrogate the DAO policy. The government is aware of no such action. Rather, the evidence will be that the policy remained in effect throughout Williams's tenure, including in 2016 when the new chief of staff restated it and left it materially unchanged. That this is true seems rather obvious; it would have been shocking, to say the least, for the District Attorney to decree a change in policy that stood him alone among all City officials in being able to use public property for personal purposes, at significant expense to the City. And moreover, Williams had no authority to abrogate the HIDTA policy, which he violated with abandon in using expensive SUVs supplied by HIDTA beginning in 2013, which were supposed to be used by the DAO for drug investigations.

Third, Williams rather stunningly suggests that the DAO policy applies to "all personnel of this office" and "sworn and civilian personnel alike" – and this does not include him. He states, "The sitting District Attorney is an elected position, and as such, the former DA's policy does not apply to him." Motion at 3. This makes Abraham's testimony necessary; she will readily testify that this contention is absurd, and defeated by the plain language of the policy. The issue must be resolved by the jury, and Abraham is the proper witness to inform its assessment.

Finally, Abrahams' testimony is necessary to defeat another anticipated defense, which was previewed by a girlfriend of Williams in markedly hostile testimony to the grand jury: that Williams's position required "24/7" devotion and therefore necessitated his use of an official vehicle at all times. Abraham is the most appropriate witness to address this issue, having served for nearly 19 years in the position, as Williams's

immediate predecessor. She will explain that while a District Attorney may certainly be called at any hour of the day or night, such occasions are rare, and when they occur, the District Attorney may always travel in a personal vehicle or with an immediate police escort. She will testify that there is no reason that a District Attorney needs an official vehicle while on vacation, while out of the city on non-official business, or while attending to personal matters in the city after working hours, and that such conduct is explicitly barred by the policy she approved and which remained in effect during Williams's tenure.

For all of these reasons, Abraham's testimony is necessary and appropriate, and the motion to exclude it should be denied.

### B.    The Testimony of Monique Wescott is Relevant and Admissible.

Monique Wescott was a community outreach official in the District Attorney's Office, and also assisted Williams in the management of a charitable endeavor, the Second Chance Foundation. In moving to exclude her testimony, Williams states: "Mr. Williams has not been charged with any crimes in connection with his Second Chance Foundation. Mr. Williams requests the government be barred from calling her at trial." Motion at 3.

However, as Williams is aware, the government at this time properly plans to call Ms. Wescott because she observed Williams and his girlfriend and family members using City vehicles for personal purposes outside working hours. Her brief testimony will assist in proving the vehicle fraud allegations of the Superseding Indictment. The motion to exclude her testimony should be denied.

### C.    The Testimony of Aubrey Montgomery is Relevant and Admissible.

Williams moves to exclude the testimony of Aubrey Montgomery. Her expected testimony is set forth at length in the government's pending motion to introduce Rule 404(b) evidence concerning his 2009 campaign for District Attorney. In brief, Montgomery was the finance director for Williams during part of that campaign. She discussed with him the pertinent campaign finance laws, and raised concerns regarding the purpose of certain expenditures and the methods of payment. As explained in the motion, her testimony is relevant to show Williams's knowledge regarding the applicable rules he later violated in the charged conduct in this case, by spending PAC funds for personal purposes.

In seeking to exclude her testimony, Williams does not address its relevance. Instead, he argues:

> Testimony regarding the appropriateness of PAC expenditures requires expertise. This witness is not an expert in campaign finance laws nor can she opine about what her opinions are regarding the restrictions of PAC expenditures. Whatever she may have told Williams regarding PAC expenditures are her opinion, and she is not an expert. Therefore, her testimony is irrelevant.

Motion at 4.

This argument is baseless. The government is not calling Montgomery as an expert witness; it is calling her because of specific conversations and communications she had with Williams, which informed him of the applicable law. Such evidence is proper and vital in proving Williams's later knowledge and intent to defraud, as explained in the government's 404(b) motion.

- 58 -

Further, no expert testimony is required in this case, and the government does not

plan at this time to offer any in its case in chief. Expert testimony is admissible if, in part,

"the expert's scientific, technical, or other specialized knowledge will help the trier of

fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Thus, expert testimony is not appropriate "when that testimony ventures into areas in

which the jury needs no aid or illumination." *United States v. Gibbs*, 190 F.3d 188, 212

(3d Cir. 1999). *See also United States v. Stevens*, 935 F.2d 1380, 1384 (3d Cir. 1991)

(describing the helpfulness requirement as the "touchstone" of Rule 702).

In this case, as explained in part III of this memorandum, the operative question

with respect to the PAC fraud is whether the expenditures at issue were for "the purpose

of influencing the outcome of an election." That is a legal phrase, which a lay jury is as

competent to apply as any other. The jury needs no expert assistance in this case to

determine whether facials, massages, gym clothing, birthday parties, and the other

egregious expenditures charged in this case were for the purpose of influencing the

outcome of an election, and therefore the government will not ask Ms. Montgomery her

expert opinion (though she surely could be qualified as an expert if necessary) nor does it

plan to call another expert on this point. The motion to exclude her testimony should be

denied.

### D.    Testimony Related to the PAC Fraud is Appropriate.

Williams moves to exclude much of the evidence concerning the alleged PAC

fraud, specifically the testimony of Zeli Colon and Lisette Gonzalez, who were finance

directors of the PAC at various times; the testimony of Williams's girlfriend, Stacey

Cummings, who partook in personal activities paid for by the PAC; and records of the

Union League and the Sporting Club where many of the improper expenditures took

place. Williams does not specifically address any of the testimony or evidence, and

instead just repeats his argument that all personal expenditures were permissible under

state law. As explained in part III of this memorandum, that argument is without merit.

Therefore, the motion in limine to exclude PAC evidence should also be denied.

> **E.      The Statements of Financial Interest and Other Reports to the
>             Philadelphia Board of Ethics Are Admissible to Prove Concealment.**

Williams asserts that "his Amended Statements of Financial Interests and Ethics

Violations are not relevant to the criminal charges he now stands accused and requests

this Court from barring any evidence related to these two issues." Motion at 4. This

request should be denied.

The government will show that during the time he received extensive benefits

from Ali and Weiss, Williams did not report them on Statements of Financial Interest he

was required by law to file with the City and Commonwealth. Later, after he learned that

he was under federal investigation, he filed amended statements which disclosed most but

not all of the gifts. The Philadelphia Board of Ethics investigated the matter, finding

some gifts on its own, and ultimately reaching a settlement agreement regarding

Williams's liability for violation of ethics requirements.

In seeking to exclude the evidence, Williams writes:

> Introduction of the Amended Statement of Financial Interests merely corroborates
> the gifts received by Mr. Williams. The defense does not and will not at trial
> attempt to argue that he did not receive these gifts. Also, evidence that the
> defendant received gifts will be introduced through other witnesses (Michael

Weiss, Williams Weiss and Mohommad Ali). The reception of the gifts is not a crime, even if not properly listed in the Statement of Financial Affairs. The introduction of such evidence, particularly the Ethics Charge, will lead the jury to improperly conclude that the defendant is guilty simply by accepting the gifts, or by accepting them, and not reporting them.

Motion at 9.

Williams appears to make two arguments here. First, he suggests that the government is offering the amended statements to prove that he received the gifts listed there. That is partly true. Williams's receipt of the gifts will mostly be proven independently, with limited exceptions. Notably, his receipt of $2,000 in cash from Ali was discovered through an admission he made on an amended Statement of Financial Interest. Such evidence is entirely permissible as a party admission under Federal Rule of Evidence 801(d)(2)(A).

Apart from that, the primary relevance of the financial statements is that Williams initially did not report the gifts at all, and only reported them when he became aware of the investigation. That is proof of consciousness of guilt. In the bribery allegations, the superseding indictment states that Williams as a public official was required to file Statements of Financial Interest reporting certain income and gifts, and on the required statements from 2012 through 2015 omitted his receipt of benefits from Ali and Weiss. The indictment then further alleges that, once he became aware of the federal investigation, Williams filed amended SFIs reporting some of the gifts, but even then did not report all, including the used Jaguar he received from Weiss. Superseding Ind. at pp. 6, 20. The indictment adds:

On or about January 17, 2017, defendant WILLIAMS entered into a settlement agreement with the City's Board of Ethics in which defendant WILLIAMS represented and warranted that, except for his receipt of additional valuable benefits set forth in that agreement, the information in his amended City SFIs was accurate and complete in all material respects. However, defendant WILLIAMS's amended City and State SFIs and his settlement agreement with the City's Board of Ethics still failed to report defendant WILLIAMS's receipt of the pre-owned 1997 Jaguar XK8 convertible and payment of insurance premiums from Business Owner #2.

*Id.* at p. 21.[21]

In his second argument, Williams appears to question the relevance of this evidence. The evidence is powerfully relevant, showing that he not only received many lavish gifts from Ali and Weiss but also failed to report it until the bounty was discovered by other officials. As courts universally recognize, such proof of concealment is evidence of consciousness of guilt, from which guilt of a bribery offense may be inferred. *See, e.g., United States v. Beldini*, 443 F. App'x 709, 721 (3d Cir. 2011) (not precedential) (public official's effort to conceal cash payments "shows her consciousness of guilt"); *United States v. Abate*, 302 F. App'x 99, 102 (3d Cir. 2008) (not precedential) (in a bribery case, "[s]uch circumstantial evidence is entirely appropriate"); *United States v. Levy*, 865 F.2d 551, 558 (3d Cir. 1989) (en banc) ("the defendants' attempt to conceal their true identities by providing aliases to the police upon arrest is relevant as consciousness of guilt");

---

[21]  The evidence will be that Williams amended his SFIs once he became aware of the federal investigation, leading the Board of Ethics to sanction him. The Board also discovered on its own additional information that Williams still did not reveal, notably over $4,000 in cash which Williams took from the PAC and used for personal purposes in 2010. Williams then took responsibility for such receipts in the final settlement agreement with the Board.

*United States v. Verrusio,* 762 F.3d 1, 18 (D.C. Cir. 2014) (false statements in corruption case, including failure to disclose trip on financial disclosure form, is evidence of consciousness of guilt); *United States v. Rosen*, 716 F.3d 691, 702 (2d Cir. 2013) (a payor's concealment of consulting agreements with a state legislator shows either a deliberate attempt to conceal a corrupt relationship, or consciousness of guilt); *United States v. White*, 663 F.3d 1207, 1214 (11th Cir. 2011) (a county commissioner who received cash payments did not disclose the payments as required by administrative order; this evidence supported the bribery conviction, as "[t]he corrupt usually don't advertise their corrupt ways, or as we noted in *McNair*, 'the extent to which the parties . . . conceal their bribes is powerful evidence of their corrupt intent.'") (*quoting United States v. McNair*,  605 F.3d 1152, 1197 (11th Cir. 2010)); *United States v. Rybicki*, 287 F.3d 257, 264 (2d Cir. 2002) (a mail fraud defendant's efforts to avoid detection by omitting information from financial records was "indicative of consciousness of guilt"); *United States v. Blackley*, 167 F.3d 543, 548 (D.C. Cir. 1999) (aide to cabinet secretary received $22,000 from individuals regulated by the agency; "concealment of such receipts, especially in the context of a financial disclosure form intended to bring suspicious influences to the surface and in response to questions of inspectors general, tends not only to prevent discovery of underlying crimes such as receipts of bribes or gratuities, but also to reflect the perpetrator's consciousness of guilt in those receipts.").

The jury will be properly instructed regarding the permissible use of this evidence. It will not be invited to convict based on a violation of state financial disclosure rules.

The evidence regarding SFIs is thus relevant and poses no risk of prejudice. The motion to exclude this evidence should be denied.

### F.     The Sequestration of Case Agents is Rejected By Law.

Without providing any authority or rationale (and indeed while acknowledging that Third Circuit precedent defeats his request), Williams asks for sequestration of case agents. He states:

> We respectfully request that the Court order sequestration of all Government witnesses including case agents. See Fed.R.Evid. 615. In the alternative, we request that only one case agent be permitted to remain in the courtroom. Mr. Williams concedes that this Circuit has recognized a "case agent" exception to the usual practice of sequestration. *See United States v. Gonzalez*, 918 F.2d 1129, 1138 (3d Cir. 1990).

Motion at 6.

The government, of course, will sequester its non-agent witnesses, as we are confident the defense will as well. However, the law permits the presence of case agents in the courtroom. In this case, there are several such agents, which is a feature of a prosecution such as this, which involves a number of distinct schemes falling within the expertise of a number of investigating agencies.

The principal case agent is FBI Special Agent Vicki Humphreys, who oversaw all aspects of the investigation and accordingly will assist the prosecutors throughout the trial. She will also likely testify as a summary witness. At present, the only other agent whose testimony we expect to present is Thomas Acerno, a special agent of Homeland Security Investigations (HSI), who investigated Williams's effort to intercede on behalf of Mohammad Ali in airport screenings. It was Agent Acerno's investigation of Ali

which triggered the airport screenings that Williams attempted to halt. Finally, the government will present the testimony of Cynthia Fusco, an investigative auditor in the United States Attorney's Office (EDPA) who reviewed and summarized extensive financial records relevant to various charges in the case.

Other agents assisting the prosecution, though likely not testifying, include FBI Special Agents Andrew Haugen and Jennifer Zenszer, and IRS Special Agent Michael Pohar.

The government does not anticipate that all of these agents, other than Agent Humphreys, will attend all of the trial. Rather, the others, while often attending the trial, will be engaged in assuring the smooth flow of witnesses regarding the multiple alleged schemes. Their efforts will assist the Court as well as the government in assuring an efficient trial. This case involves five charged schemes (regarding Ali, Weiss, nursing home fraud, PAC fraud, and vehicle fraud), and rests on tens of thousands of records gathered from scores of witnesses. The government, as the party bearing the burden of proof, has the responsibility to harness the evidence and present a seamless case. To accomplish this, it has sensibly divided the responsibilities of the agents, assigning each responsibility for particular parts of the case. The knowledge of each is therefore indispensable to the prosecutors in presenting the case at trial and responding to the defendants' arguments and evidence.

Under the Federal Rules of Evidence and pertinent case law, the government is permitted by rule to have a case agent/witness in the courtroom, and in a case such as

this, to have multiple such agents attend the trial and testify for the purposes identified

here. Federal Rule of Evidence 615 provides:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding:
>
> (a) a party who is a natural person;
>
> (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney;
>
> (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or
>
> (d) a person authorized by statute to be present.

The Third Circuit has held that "the government case agent responsible for a particular

investigation should be permitted to remain in the courtroom, even though the agent will

often testify later on behalf of the government. Such an exception is envisioned by Rule

615(2), and it is further supported by legislative history." *United States v. Gonzalez*, 918

F.2d 1129, 1138 (3d Cir. 1990). (At the time, Rule 615(2) referred to "an officer or

employee of a party which is not a natural person designated as its representative by its

attorney." The pertinent language now appears in Rule 615(b); the Advisory Committee

which restyled the rule in 2011 stated that no substantive change was intended.)

The statement that a party may designate "an officer or employee of a party that is

not a natural person" does not preclude the possibility of designation of more than one

such person in an appropriate case. The Senate report which accompanied the revision of

Rule 615, a report which was approvingly quoted both in the 1974 Advisory Committee

notes and by the Third Circuit in *Gonzalez,* expressly refers to plural "investigative

agents" as being excepted from the rule. Notably, in this case, any government employee who testifies will testify regarding a distinct matter. And there is no concern that the agent-witnesses would learn others' testimony by being in the courtroom:  as case agents, each already knows what the other witnesses' testimony will be. In *Gonzales*, the Third Circuit made a similar point, stating: "[The defendant's] argument that the agents could coordinate their testimony does not pose a likelihood of prejudice since they had ample time before trial to do that, were they so inclined."  *Gonzalez*, 918 F.2d at 1138 n.8. Notably, Williams has not cited any concern regarding the presence of agents in the courtroom, or indeed any reason at all for his request.

In similar circumstances, other courts have properly exempted more than one case agent from the sequestration requirements of Rule 615. *See, e.g., United States v. Green*, 293 F.3d 886, 892 (5th Cir. 2002) (district court properly permitted three case agents to sit at counsel table and testify at trial because the "case was complex. The investigation was lengthy, broad geographically, and involved numerous witnesses."); *United States v. Jackson*, 60 F.3d 128, 134-35 (2d Cir. 1995) (rejecting claim that district court committed reversible error by permitting three case agent witnesses to sit at counsel table, noting that "[b]ecause the Rule does not expressly limit to one the number of exemptions per provision, we conclude that this discretion extends to deciding whether, in a particular case, more than one witness should be exempt"); *United States v. Payan*, 992 F.2d 1387, 1394-95 (5th Cir. 1993) (trial court did not abuse discretion in permitting two case agent witnesses to remain present during trial; Rule 615 exclusion not limited to only one representative).

In sum, Williams's unsupported request for sequestration of agents should be denied. Agent Humphreys is the government's representative, who is permitted by Rule 615 to remain in the courtroom, and the presence of additional government representatives is warranted to assure the smooth presentation of evidence, and presents no risk of prejudice to the defendant.

Respectfully submitted,

JEFFERSON B. SESSIONS III
Attorney General of the United States

WILLIAM E. FITZPATRICK
Acting United States Attorney
for the District of New Jersey


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
VINEET GAURI
ERIC W. MORAN
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified

below through the Electronic Case Filing (ECF) system:

Thomas F. Burke, Esq.
Borum Burke & DiDonato LLC
Two Penn Center Plaza
1500 John F. Kennedy Blvd., Ste. 900
Philadelphia, PA  19102

*/s Vineet Gauri*
VINEET GAURI
Assistant United States Attorney

Dated:  May 26, 2017.